Millard L. Midomick, J.
The problems presented in this matter are so basic, and in certain respects so novel, that an opinion is deemed advisable.
The problems herein arise from two sources:
A — The requirement of corroboration for extrajudicial confessions of children under the Family Court Act.
B — The duties and limitations upon peace officers with respect to searches and seizures.
This respondent boy, concededly 15 years of age, is charged in the petition with the following conduct: “ On or about July 19, 1963, at about 6:30 p.m., at the corner of 14th Street and 31st Avenue, New York, and elsewhere in Astoria, Queens County, he violated a law of the State of New York in that he was in unlawful possession of two bottles of barbiturates containing forty-two Doriden pills and 6% green pills; said barbiturates can only be obtained by a doctor’s prescription. The above named youth had prior to his apprehension been observed by the petitioner being approached by another youth who placed a dollar bill upon a mail box and in return received something from the above named youth, said object being taken from (respondent’s) right pants pocket. In (respondent’s) right pants pocket was found the two bottles of barbiturates containing the Doriden and other barbiturate pills. ’ ’
A. The requirement of corroboration for extrajudicial confessions of children.
*196 It should be observed that there was only one witness who testified at the fact-finding hearing, and he was the petitioning correction officer alone. The law guardian advised the respondent child of his right to remain silent, and his silence was unbroken. There were no other witnesses available for the fact-finding hearing.
This court was tempted to adjourn the hearing, after it developed that no chemical analysis was yet available, for the purpose of obtaining such analysis from the Police Department laboratory, but upon reflection and upon hearing all of the unusual details of evidence in this case, it seemed unnecessary to adduce further evidence to prove a prima facie case and it was so decided. The respondent rested after one witness testified for the presentation of the petition.
Because of the failure to analyze the pills received in evidence as petitioner’s Exhibits 1 and 2, found in the possession of this boy by the petitioner in unlabeled bottles, there are lengthy observations and findings which I am required to make. Hopefully, this opinion may shed more light on the juvenile drug problem and simplify the evidence and procedures in similar cases. Many cases involving “ Doriden ” and codeine have been heard by me in a short span of time. This court is not unaware of barbiturate problems, nor of the misuse of the myriad other dangerous drugs which seem to fall into the hands of children. I have had the painful duty of sending 15-year-old heroin users to hospitals on several occasions.
A “ ‘ fact-finding hearing ’ means in the case of a petition to determine delinquency, a hearing to determine whether the respondent did the act or acts alleged in the petition which, if done by an adult, would constitute a crime. In the case of a petition to determine need for supervision, * fact-finding hearing ’ means a hearing to determine whether the respondent did the acts alleged to show that he violated a law or is incorrigible, ungovernable or habitually disobedient and beyond the control of his parents, guardian or legal custodian.” (Family Ct. Act, § 742.)
This petition is one to determine delinquency. Under subdivision (a) of section 716 of the Family Court Act, “ On its own motion and at any time in the proceedings, the court may substitute for a petition to determine delinquency a petition to determine whether a person is in need of supervision.” While the'time has not come for such action until the seriousness of this boy’s condition shall have been reported and assessed on the basis of the Probation Department’s investigation and the psychiatric study ordered, such a reduction in the gravity of the *197 finding may be made if it is indicated that this boy is more properly to be held “incorrigible” or “ungovernable” or “ habitually disobedient and beyond the control of his parents,” or that his conduct ‘ ‘ violated a law ’ ’ — rather than ‘ ‘ constituted a crime.”
In either case,1 ‘ Only evidence that is competent, material and relevant may be admitted in a fact-finding hearing ”, and, “ Any determination at the conclusion of a fact-finding hearing that a respondent did an act or acts must be based on a preponderance of the evidence. For this purpose, an uncorroborated confession made out of court by a respondent is not sufficient.” (Family Ct. Act, § 744.)
Moreover, “ No adjudication under this article may be denominated a conviction, and no person adjudicated a juvenile delinquent or a person in need of supervision under this article shall be denominated a criminal by reason of such adjudication.” (Family Ct. Act, § 781.)
Indeed, the finding of fact as to conduct alone may not support an adjudication either of “delinquency” or of a “person in need of supervision ”, i.e., “PINS”. This petition will be dismissed without any adjudication of ‘ ‘ delinquency ’ ’ or “ PINS ” if the probation and psychiatric reports indicate that the boy is not in need of supervision, treatment or confinement under court order. (Family Ct. Act, §§ 743, 745, 752.) In this respect, a finding of delinquency or PINS requires a basis of a finding of a condition showing need for the attention of the court, in addition to the mere conduct alleged, and in this respect differs from the criminal court procedures for older persons. The Family Court does not find a child “delinquent” or “ PINS ” unless there is need for its rehabilitative or protective functions.
The rules of evidence for the protection of parties in all trials at law apply in the Family Court but the quantum or weight of the evidence need only amount to the “ preponderance ” of the civil trial, not the proof “ beyond a reasonable doubt ” required to convict an adult criminal.
While only one witness testified (the correction officer who is the petitioner herein), his testimony and the many pills received in evidence found in the possession of the respondent boy meet all of the statutory standards for a prima facie fact finding on a preponderance of the evidence that the respondent did the act or acts alleged in the petition, namely, that on a public street he had in his possession and sold and distributed drugs — conduct which, if he were an adult, would have constituted at least a criminal misdemeanor.
*198 The officer testified and I find as follows: From a distance of about 30 feet, he observed the respondent approach a youth at a United States mailbox on a public street in daylight, take a bill of currency placed on top of the mailbox by the youth, pass an unseen object in his closed hand to the youth, and then the witness followed the respondent as he shuffled unsteadily, evidently intoxicated by alcohol or a drug, for about two blocks until he turned through the doorway of a grocery store. The officer thereupon spoke to the respondent in the store — observing that the shuffling boy appeared to be dazed, or drugged, with half-closed eyes — identifying his official character and requesting that the boy permit himself to be “frisked.” The boy co-operated without objection. Upon tapping his clothes in the well-known manner, the officer noticed hard objects in a pocket. He then asked the boy to empty his pockets. Still co-operating without objection, the boy produced two unlabeled brown bottles containing dozens of pills (marked in evidence as petitioner’s Exhibits 1 and 2) and nine one-dollar bills. The respondent confessed on the spot, as the officer testified, that the many white pills (impressed with the drug manufacturer’s mark “GIBA”) were “Doriden” and that the green pills were “ barbiturates ”, that he had sold the “ Doriden ” pills at a price of 50 cents each and the “ barbiturate ” pills at a price of five pills for $1. He stated that he could not remember or did not know the name of the man from whom he had obtained the pills, a strange man in a park. Quite importantly, the boy further admitted that he had been himself taking “ these pills ” for about one and one-half months, and that his obviously “doped” condition, the reason for which the officer inquired, was the result of the taking by the respondent of some of “ these pills ’ ’ now in evidence.
I find all of the above admissions to be true in fact, and I infer and find that at least one of the nine one-dollar bills represented the proceeds of the sale of these pills observed by the witness on the public street which attracted the officer’s attention to this respondent and caused him to follow the boy, to observe his apparent toxic condition on a public street, to search him with his acquiescence, to obtain a voluntary confession from him, and finally to arrange to take him into custody. I further find, as the boy first admitted to the officer, that all of the nine one-dollar bills were proceeds of various sales of these pills.
In order to constitute the unlawfulness charged in the petition, I must further find, with legal basis in the evidence, that these pills in evidence and sold as observed were “ drugs or *199 devices” whose possession, sale and/or distribution by the boy was unlawful.
Objection to such a finding is made by the boy’s Law Guardian for lack of corroboration of the confession and for lack of proof by a qualified chemist or laboratory that these were “ drugs ” or were even what the boy expressly said they were, uncontrovertedly, “ Doriden ” and “barbiturates”, when he was being questioned upon handing over these pills to the petitioner. (The motion to suppress the pills when offered in evidence, on the ground of alleged unreasonable search or seizure, is dealt with last.)
This was not a case of evidence limited to a confession simply. The extrajudicial admissions or confession would have been insufficient if the boy had given himself up, or had been arrested, at a time and place unconnected with the alleged transgressions, and had alertly recounted the above story without eyewitness evidence at the scene itself, and without producing the physical pills and demonstrating his own drugged appearance. The officer actually saw substantial elements of the “ crime ” of sale and distribution enacted before his very own eyes and so testified. This is inferred from the eyewitness testimony, taken together with the confession of the respondent which is the key to the conduct observed on the public street. Further corroboration of the boy’s admissions were the drugged physical appearance and shuffling gait of the boy, corroborating his assertion that he had himself taken “ these pills ” which he had assertedly been selling at specified prices. Additional corroboration of the boy’s admissions were found and related in the form of the pills themselves which were received in evidence physically, and in the nine one-dollar bills produced by the boy as the proceeds of sales of the pills.
Additional evidence of commission of crime, which must be produced to warrant a finding against him based in part on his confession, need not apply to every element of the crime charged, nor need the confession itself be corroborated. (People v. Warner, 152 Misc. 607, affd. 244 App. Div. 833, affd. 269 N. Y. 597; People v. Jaehne, 103 N. Y. 182; People v. Conroy, 287 N. Y. 201; Richardson, Evidence [8th ed., 1955], p. 316.)
A somewhat unusual aspect of this trial was the lack of the customary chemical or laboratory proof of the composition of the pills introduced in evidence and received over the objection of the Law Guardian. Certainly such scientific evidence would usually be required if the respondent had not himself specified that these pills were “ Doriden ” and “ barbiturates.” Apart *200 from this hoy’s statement including nomenclature, his physical condition of marked drowsiness or “dopiness ” (quite different from his alert appearance at the trial 10 days later), admittedly by reason of taking of “ these pills ” provided its own laboratory better than any chemist’s. No chemist or doctor predicted the evil effects of thalidomide pills taken by pregnant women until hundreds of babies were born deformed. It is common knowledge that doctors, chemists and other -scientists are quite unable to assure that no “ side effects ”, such as respondent’s drowsiness, will occur until the human body itself gives them the answer. Here the officer as an eyewitness observed and testified as to some evil effects of these pills on this boy. I find that the boy admitted to the officer that his physical condition was due to taking “ these pills.”
Moreover, the boy himself was, by his admission to the officer, an habitual user of these pills and I, therefore, infer that he had acquired a thorough knowledge as to their potency as indicated by his observed condition. He knew very well when he said that these pills were “ Doriden ” and “barbiturates ” that they were potent drug agents in light of his own reactions, one such marked reaction being in progress at the time of his arrest. I infer and find therefore that his knowledge of his own symptoms was considerable, and that his habitual use of these drugs made him superior to the layman nonuser in his ability to recognize them and to name them accurately, at the very least to know them to be “ drugs ’ ’ rather than harmless pills of no effect. Surely, a boy of 15 can admit extrajudicially that he is himself intoxicated, whether it be with the toxic effect of alcohol or the toxic effect of a “ drug ”. (Cf. People v. Eastwood, 14 N. Y. 562, Richardson, Evidence [8th ed., 1955], p. 352.) As stated in Wharton’s Criminal Evidence (12th ed., 1955, Yol. 2) at pages 119-120: 11 The court should look to the circumstances under which the confession is alleged to have been made, and consider the strength or weakness of the accused’s intellect, his knowledge or his ignorance, and whether the declarant had full control of his mental faculties at the time he made the confession, and whether he realized the import of his act. * * * A partial loss of faculties, for any reason, does not render a confession involuntary, but does affect its weight, and this should be considered by the jury.” (Cf. Richardson, Evidence [8th ed., 1955], pp. 310-311.)
If a respondent or a defendant accused of willful possession or selling of narcotics or other drugs were required to have scientifically exact knowledge of the nature of such substances at the time of arrest, no one could ever be convicted of such a *201 crime except a chemist who had analyzed the substance, or a defendant who had received a certified laboratory analysis of the substance; mere possession of any chemical would be without guilty knowledge, unless assisted by expert opinion prior to arrest. Even if the finest chemist available were to testify as to the results of analysis of heroin, for example, the possessor could successfully defend on the simple but ridiculous ground that he had been too inexpert at the time of arrest to “ know ” that the substance found in his possession was heroin, or was whatever drug he is accused of unlawfully possessing or distributing. Such an absurd result would follow such a doctrine even though a chemist had analyzed the true nature of the drug after the accused’s arrest, and so testified.
In the case before us, the chemist’s art would be required if the boy had not described so succinctly what he knew. Had the chemist been called for laboratory results, the inference would still have been needed to ascribe guilty or willful knowledge of the nature of these pills to this boy. The boy having admitted his own knowledge, based upon a month and a half of his habitual use of these pills, the chemist may be dispensed with and the inference bows to the direct statement of the respondent boy. Unhappily, this boy had become a manner of “ expert ” in the misuse of these drugs by continuous self-administration, and by the “ laboratory ” results offered up for the witness to see in the form of the boy’s dazed physical body.
The possession proved here of “ barbiturates ” is prohibited as a violation of the Penal Law by the very term ‘ ‘ barbiturates ’ ’ itself, and so the barbiturates present no problem of proving some of these pills to be prohibited “ drugs ”. (N. Y. City Health Code, §§ 75.01, 75.11; Penal Law, §§ 1740,1747-b.)
This is expressly so under section 1747-b of the Penal Law which prohibits the mere possession of a “ barbiturate ” without a proper label (here there was no label whatsoever). “ § 1747-b. Sale or possession of barbiturate drugs or preparations. The possession, sale, exchange or giving away of barbiturate drugs or preparations by other than registered manufacturers, manufacturer’s depots, wholesalers, pharmacists, practitioners of medicine, dentistry, podiatry or veterinary medicine and the possession by other than persons who obtain barbiturates on the prescription of a duly licensed practitioner, provided such barbiturates are in the pharmacists’ original or renewed prescription container or practitioner’s dispensing container which containers shall bear a label meeting all the label requirements of the laws relating to the labeling of barbiturates, shall constitute a violation of the penal law.”
*202 The use of ‘ ‘ Doriden ’ ’ is also interdicted as shown by judicially noticeable laws and facts. “ Doriden ” is a “ drug ” as will be demonstrated presently by citation of officially designated publications. The sale of any drug or even the distribution of any drug free of charge on any public street in the City of New York is a misdemeanor.
The term “ Drugs ” is defined in section 6801 of the Education Law:
1 ‘ 14. Drugs means:
“ a. Articles recognized in the official United States pharmacopoeia, official homeopathic pharmacopoeia of the United States, or official national formulary, or any supplement to any of them.
‘ ‘ b. Articles intended for use in diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals.
“ c. Articles (other than food) intended to affect the structure or any function of the body of man or other animals.
“ d. Articles intended for use as a component of any article specified in paragraphs a, b, or c ” (italics supplied).
The highly sedative effect of ‘ ‘ these pills ’ ’ on this boy, in the form of his dazed condition, was proved by the eyewitness testimony of the correction officer coupled with the boy’s admission that “ these pills ” were the cause of his observed condition. I find that these are “ drugs ” because they were affecting the functions of his body as specified above in the Education Law.
Moreover, it is stated in Richardson on Evidence (8th ed., 1955, pp. 5-6):
“ In addition to notorious facts, the court will take judicial notice of facts ‘ which are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy. ’ Model Code of Evidence, R. 802 (c); Wigmore on Evidence, 3d Ed., sec. 2571 (3). * * *
“ § 10. Judicial Notice of Things Unknown to the Court.
“Judges frequently take judicial notice of notorious matter which, at a given moment, may be personally unknown to them. In such cases, recourse is had to such documents, references, and repositories as are worthy of belief and confidence. * * * Civ. Prac. Act, see. 344-a subd. C; School District v. Insurance Co., 101 U. S. 472, 25 Law. Ed. 868; Hunter v. New York, Ontario & Western R. R. Co., 116 N. Y. 615, 23 N. E. 9, 6 L. R. A. 246.”
It is sufficient under these principles and provisions of law that judicial notice be taken that “ Doriden ” was registered as a trade-mark in the United States Patent Office on June 22, 1954 *203 on the Principal Register No. 591,588. The trade-mark is officially registered in the United States Patent Office by Giba Limited (Swiss Corporation) as follows: “For: sedative and HYPNOTIC, in CLASS 18.”
Moreover, judicial notice is taken further that the substance known as “Doriden” is officially registered in the United States Patent Office on March 23, 1954, No. 2,673,205 as “3 — Disubstituted Dioxopiperidines and the Manufacture Thereof. ’ ’
In the official registered patent itself the following statements are made:
“ These new compounds possess valuable pharmacological properties and may be used as medicaments. They have a pronounced anti-convulsive effect; especially effective is the 2-phenyl-3-ethyl-2, 6-dioxo-piperidine.
“ This effect was tested in mice and rats against shocks produced in different ways. Both the electroshock and the shock due to pentamethylene tetrazole were relieved with doses which are too small to produce general toxic symptoms. Spasms due to strychnine or sound irritation can also be suppressed. ’ ’
Moreover, the chemical of which “Doriden” is made is specified in the official National Formulary which is incorporated by reference in the Education Law (§ 6801, supra) defining “ drugs ” as articles “ recognized ” in that professional tome copyrighted by the American Pharmaceutical Association. At pages 152-153 of the latest edition 11th of the said National Formulary (1960) Doriden’s chemical components were described in part as follows:
“ Tablets available — Grlutethimide Tablets usually contain the following amounts of glutethimide: 125, 250, 500 mg. * * *
“ Category — Central depressant. Usual dose — sedative, 125 mg. up to three times a day. Hypnotic, 500 mg. * * *
“ 2-Ethyl-2-phenylgiutarimide * * *
“ Ci3Hi5N02 ”
Finally, a “ new drug ” application for “ Doriden ”, indicating as required its chemical components, was filed with the United States Food & Drug Administration, No. 9519, and it was indicated effective as a “ new drug ” by that Federal agency officially on November 9,1954.
State Bd. of Pharmacy v. Matthews (197 N. Y. 353 [1910]) was a civil action (for three penalties of $25 each for unlawful sale of “medicines” known as tincture of iodine, tincture of arnica and spirits of camphor) in which each of three substances was held to have been proved to be “ medicines ”. As a civil *204 action, the same quantum of proof by a preponderance was there required, as in this proceeding. On page 356 the opinion for the unanimous Court of Appeals observed, contrary to a finding by the trial court which had disregarded an expert’s opinion to this effect: “As to the first question I think that the courts may take judicial notice of the fact that tincture of iodine, spirits of camphor and tincture of arnica are medicines ”. (Richardson, Evidence [8th ed.], p. 22.)
I find that both the “ barbiturates ” and the “ Doriden ” pills were “ drugs ” illegally possessed, sold and distributed by this respondent on a public street at the time and place alleged, and that his said conduct would be violative of several penal laws if he were older than 16 years of age, among others being section 1740 of the Penal Law making it a misdemeanor for a person to willfully violate or refuse or omit to comply with any lawful order or regulation prescribed by any local board of health. Such a regulation is section 75.21 of the New York City Health Code (judicially noticed pursuant to Civ. Prac. Act, § 344-a; cf. CPLR, § 4511):
“ § 75.21 Sale from door to door and on public streets and distribution of samples prohibited
“ (a) No person shall sell or offer for sale any drug or device from door to door, or in any public street, highway or park.
“ (b) No person shall distribute free of charge or throw away any drug or device in any public street, highway, park or other public place, or from door to door, or by leaving it upon private premises. This subsection shall not apply to the distribution of sample drugs or devices by manufacturers ox-wholesale dealers to practitioners or to the drug trade. Such samples, however, in additioxx to other labeling required pursuant to this article or Article 71 of this Code, shall conspicuously bear on the label the words, ‘ SAMPLE — NOT TO BE SOLD ’. No person shall sell or offer for sale any such sample.”
The issue is not necessarily what “ Doriden ” is or what kind of barbituric acid constituted the “ barbiturates ” here involved, although the proof supported the allegations as herein amended. The ultimate fact is whether respondent was unlawfully in possession of, selling, and/or distributing a “drug” within the meaning of the above regulation. The violation of the New York City Health Code and the Penal Law cited was amply proved. But since the judicial notice here taken was without advance notice to respondent, and since, by their nature, some of these facts noticed are not incontrovertible, the respondent by the Law Guardian is advised again, as he was advised at the *205 hearing, that a motion to reopen the fact-finding hearing will be granted if the respondent’s proof is ready at the next hearing scheduled September 11, 1963 for further disposition. (See 9 Wigmore, Evidence [3d ed.], § 2567; Morgan, Judicial Notice, 57 Harv. L. Eev. 269; Eichardson, Evidence [8th ed., 1955], pp. 7-9.) Compare Hunter v. New York, O. & W. R. R. Co. (116 N. Y. 615), where the Court of Appeals granted a new trial on the basis of facts judicially noticed for the first time in that court of last resort.
A prima facie case having been most satisfactorily proved herein, the respondent has since that finding and ruling been under the most definite burden of going forward with his defense evidence. If he does not go forward successfully, the finding already made ‘ ‘ against ’ ’ him can stand with finality.
At the next dispositional hearing there will be further evidence in the form of probation and medical reports of the respondent’s condition, as well as evidence of the “Doriden” manufacturer’s warnings as to dangers to susceptible persons, particularly psychoneurotics, addicts, or alcoholics, dangers of side effects, cases of dependence and withdrawal reactions, and dangers of lethal effect similar to barbiturate poisoning due to gross overdosage.
In view of the erroneous description of “ Doriden” in the petition as a “ barbiturate ”, the petition is hereby amended to describe “Doriden” as a “non-barbiturate drug”, with the same leave to respondent to counter by any defense evidence that is relevant and competent in a reopened hearing on September 11, 1963, if the respondent so desires and if the respondent is surprised by this amendment.
B. The duties and limitations upon peace officers with respect to searches and seizures.
I have denied the motion to suppress the pills and other evidence found on the person of the respondent by the petitioning peace officer. This motion was made under Mapp v. Ohio (367 U. S. 643) on the ground that there was an illegal arrest and therefore an unreasonable search and seizure.
For purposes of the remainder of this opinion, I hereby find in respect to the official character of the arresting officer who is the petitioner, that he is a “ peace officer ”. As a “ correction officer” for the Bronx House of Detention for Youths, he is “ an attendant, or an official, or a guard ” of a “ penal correctional institution” within the meaning of section 154 of the Code of Criminal Procedure. But he does not have the superior status of a peace officer who is also a “police officer” as set forth in the new section 154-a of the Code of Criminal Procedure, *206 effective July 1, 1963 (see § 177, subd. 1; § 154-a, as amd. by L. 1963, chs. 580, 581) who can lawfully arrest, and consequently “ frisk ” or otherwise search, and seize, objects from the person of arrested persons, if such a “police officer ” “ has reasonable grounds for believing that a crime is being committed in his presence ”. Such a “ crime ” need merely be, since July 1,1963, any “ act or omission forbidden by law, and punishable upon conviction by * * * Imprisonment; or * * * Fine ” (Penal Law, § 2) to empower a “police officer ” to arrest and search lawfully.
But this petitioner being merely a ‘ ‘ peace officer ’ ’ who is not a full-fledged “police officer ” under the new statutory dichotomy, we are confined to the former New York law, as molded by Mapp v. Ohio (supra) and People v. Loria (10 N Y 2d 368). That is to say, he can lawfully arrest, search and seize, without a warrant, where he has no reasonable cause to believe a felony has in fact been committed by the suspect only for a “ crime [i.e., less than a felony, Penal Law, § 2] committed or attempted in his presence ”. (Code Grim. Pro., § 177, subd. 1, as amd. by L. 1963, ch. 580; Family Ct. Act, § 721.) In other words, a peace officer who is not a member of a regularly constituted police force cannot arrest without a warrant if he “ has reasonable grounds for believing that a crime [less than a felony] is being committed in his presence ”, but only if such a lesser crime is 1 ‘ committed or attempted in his presence ’
But consent by the person searched to a search and seizure, before arrest (i.e., before taking a child into custody without a warrant under Family Ct. Act, § 721) legalizes a search and seizure under the United States Constitution (4th, 5th and 14th Arndts.) (Rios v. United States, 364 U. S. 253).
In evaluating and disposing of the problem of whether the respondent truly consented voluntarily to be “frisked” and then to hand over the pills and the nine one-dollar bills in his possession when requested to do so by the correction officer, the essential guiding direction must be found in the Federal case law rather than that of the State of New York. New York has had a long history of upholding convictions based upon unlawfully seized evidence until Mapp v. Ohio (supra) abruptly announced that State convictions contravene the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States if based on evidence obtained by unreasonable search and seizure. Any State may be more liberal with offenders accused of violation of State laws, but New York was among those which upheld convictions based upon such tainted evidence.
*207 For many years even the Federal courts upheld convictions under Federal penal statutes, if State officers had obtained tainted evidence without any Federal participation, and then handed over such evidence to Federal officers on a “ silver platter”. The “ silver platter” doctrine became suddenly extinct (although sanctioned for years by Mr. Justice Holmes and Mr. Justice Brandéis, and the entire then Supreme Court), under 5 to 4 decisions in Elkins v. United States (364 U. S. 206) and Rios v. United States (364 U. S. 253, supra). In each of those cases the four dissenting Justices would have continued to uphold the Federal convictions.
The Rios case (supra) where five Justices vacated the conviction and remanded for new trial controls the case before us, differing in its completeness in that all of the evidence as to the reasonableness or unreasonableness of the search, that is to say, the consent of the respondent, is now before us and requires no further trial.
In Rios, the majority held (364 U. S. 262): “ But the Government argues that the policemen approached the standing taxi only for the purpose of routine interrogation, and that they had no intent to detain the petitioner [passenger] beyond the momentary requirements of such a mission. If the petitioner thereafter voluntarily revealed the package of narcotics to the officers’ view, a lawful arrest could then have been supported by their reasonable cause to believe that a felony was being committed in their presence. The validity of the search thus turns upon the narrow question of when the arrest occurred, and the answer to that question depends upon an evaluation of the conflicting testimony of those who were there that night.”[2]
In the case at bar, there is no conflicting testimony, nor any evidence of objection or resistance by the respondent. Indeed, there is more evidence of consent to search and seizure of the pills and dollars than mere lack of objection and the willing compliance with requests to permit 11 frisking ” and requests for the contents of the pockets of the respondent, and by the willing delivery of those contents to the officer. Accompanying the physical co-operation by the respondent was his verbal co-operation in making a full and voluntary confession as to the nature of the pills and the source of the money. He gave the officer not only the contents of his pockets, but the contents of his memory. He did not object to being “ frisked ” nor utter the slightest objection to the entire procedure. The pills and *208 money, without the boy’s candid and full explanation of what was involved, would have revealed insufficient evidence that was understandable to the officer except to arouse his reasonable suspicion because of the boy’s condition. But since the peace officer was not a “ police officer ” under the newly-amended statute (Code Grim. Pro., § 177, subd. 1; § 154-a) reasonable grounds for believing that a nonfelonious crime was being committed in his presence was not sufficient to arrest without a warrant. However, the articles coupled with the straightforward voluntary admissions, revealed that a complete and unquestionable misdemeanor consisting of unlawful possession of unlabeled ‘ ‘ barbiturates ’ ’ was being committed in the presence of the officer, a “ crime ” of “ possession ” then and there being perpetrated in the plain sight and hearing of the peace officer, and plainly explained to him, without a shadow of any doubt whatever. (Penal Law, § 1747-b; Family Ct. Act, § 721.) Since the respondent declined to testify at the trial there is no conflict in the evidence relating to the voluntary nature of the search and seizure. Since the admittedly on-going crime was face to face with the peace officer, who was acting in a civilized, protective, considerate and kindly manner, no differently from what one would expect of a scoutmaster or a clergyman confronted with a dazed boy in this daylight situation on the public streets and in a grocery store open to the public, the search and seizure was not “ unreasonable ”, It was, on the contrary, commendable.
In the Rios case (supra), remanded for a resolution of whether the disclosure of narcotics possession was voluntarily made before the arrest, there was a night situation of officers approaching a taxi whose occupant was utterly unknown to them, involving at some point a drawn revolver used by one of the police. Since such a factual situation was held by the highest court in the land to be susceptible of a finding of consent, the innocuous cirumstances of the case at bar are, by contrast, reassuring.
I, therefore, find further that the “ arrest ” (i.e., the taking of respondent child into custody) followed the consent search and seizure, and that it was plainly permissible to a private citizen as well as to a peace officer to “ arrest” a person, after such consent search and voluntary admissions, for committing a misdemeanor, or even a crime amounting only to an offense, in the presence of the arresting person, without a warrant.
As Mr. Justice Sabaeite has held, a “ frisk ” merely to protect an officer, if it took place before grounds for arrest had been discovered, constitutes an illegal search, and an illegally carried loaded pistol so found will be suppressed. (People v. Rivera, *209 38 Misc 2d 586.) “ Thus far, the Court of Appeals has state.d that a search is reasonable if conducted by consent, or under a warrant, or incident to a lawful arrest. (See People v. Loria, 10 N Y 2d 368, supra; People v. O’Neill [11 N Y 2d 148], supra.) ” (People v. Rivera, 38 Misc 2d 586, 589, supra.)
The finding and holding above is applicable only if the search and seizure here was against the will of the respondent boy. On the contrary, and as an independent ground for the legality and reasonableness of the search and seizure here, I have found that the respondent boy did in fact consent to being “ frisked ” and voluntarily gave up the bottles of pills and nine one-dollar bills. Thus he waived his rights, just as he voluntarily admitted to the police officer that he had possession and had sold the type of drugs given up which he specified as ‘ ‘ Doriden ’ ’ and “ barbiturates ”. (Cf. People v. Alberta, 37 Misc 2d 847, involving a private person’s arrest of defendant and subsequent search permissible only on consent when requested by the private interrogator [for shoplifting].)
Mindful of the holding in People v. Moore (11 N Y 2d 271) that “ mere evidence of persons handing money [on a public street] to another person does not prove a crime ” (p. 273), I do not rely upon this feature of the facts in the case at bar. It is possible that here an arrest, before the search and revelations, could have been sustained without a confession, if a “ police officer ” had been involved, due to the surreptitious passing of an object for money. (Cf. Draper v. United States, 358 U. S. 307, including the dissenting opinion of Mr. Justice Douglas who indicated that he might look favorably on a surreptitious aspect as providing reasonable grounds for belief.)
Finally, the problem is squarely posed here whether Mapp v. Ohio (supra) applies to proceedings under the Family Court Act, since such proceedings are denominated noncriminal in nature. (Cf. Family Ct. Act, § 781.)
Since this proceeding is heard in Queens County, within the Second Judicial Department, I defer, as I would do even were the matter brought in New York County or Bronx County, by virtue of respect for the Appellate Division of the Supreme Court of the Second Department, to the majority holding in the vigorously contested case of Sackler v. Sackler (16 A D 2d 423). There by a 3 to 2 decision, now on appeal, the court decided that in a civil divorce action, illegally obtained evidence cannot be excluded in civil actions despite the doctrine of Mapp v. Ohio (supra).
*210 A Justice of the Supreme Court in Oneida County in Boceo v. Travelers Ins. Co. (38 Misc 2d 311) held to the contrary, taking issue with the SacJder holding by quoting Mapp (supra) and People v. Loria (supra) (even though each involved criminal proceedings) to the effect that “ all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court ” (367 U. S. 655; italics supplied). This applies, said the Court of Appeals “ in all trials taking place after June 19,1961 ” (10 N Y 2d 368, 370; italics supplied). In the Rocco case (supra, p. 314) the court stated: 1 ‘ It is significant that the court [Court of Appeals] did not insert the word ‘ criminal ’ before ‘ trials ’ ”,
Whatever the merits of this sharp difference of opinion as to fairness and the rights of parties to be secure against unreasonable searches and seizures in purely civil divorce proceedings, which would be equated to the support and conciliation proceedings under article 4 of the Family Court Act, such an approach has no proper place in the delinquency and need-of-supervision jurisdiction of the Family Court. I can think of few worse examples to set for our children than to visit upon children what would be, if they were older, unreasonable and unconstitutional invasions of their all-too-limited privacy and rights, merely because they are young. In this sense, our proceedings are not “ civil ”. They are perhaps, for this purpose, “ quasi-criminal ” in character. Compare the concurring opinion of Mr. Justice Goldberg in Cleary v. Bolger (371 U. S. 392, 403). Young persons have the same constitutional rights as older ones in delinquency and supervision jurisdiction, except the right to a jury trial, which is balanced by our circumscribed power and the confidentiality here maintained in an effort to keep the record of a child unblemished.
Since Family Court Judges must be fact finders as well as law interpreters, we would do well to stand solidly in behalf of children before us, to avoid contamination of the fact sources and to see to it that we brook no shabby practices in fact gathering which do not comport with fair play. We must not only be fair; we must convince the child before us that the State is firm but fair and that the Judge, a parent image, is careful to ensure those civilized standards of conduct toward the child which we expect of the child toward organized society. With deference, I hope that no Judge would disagree.

. The dissenting Justices would have upheld the Federal conviction on the ground that only State officers were involved in the search and seizure, and that, therefore, its reasonableness or unreasonableness was immaterial.