Ralph E. Cory, J.
The respondent, Joseph S., 13, is charged with assaulting, on or about 11:45 p.m. on August 18, 1969, one Edward B., 52, in a basement apartment at 218 West 141st St., New York City by striking him on the head with a cane. The respondent is further charged with causing the death of Frank H., age 55, by placing and manipulating a rope round his neck.
On consent of the attorneys, the medical examiner’s report and autopsy were accepted info evidence and a stipulation entered into by both counsel that the cause of death of Frank H. was due to ‘6 strangulation by rope with fracture of the Larynx, Homi *330 cidal ”, without the necessity of having the medical examiner present for cross-examination.
The petitioner is the detective with the Police Department, who placed the respondent under arrest on August 19,1969 after the police investigation and interrogation of the respondent and several other persons had been completed, for committing acts, which if done by an adult would constitute the crime or crimes of assault and homicide, in accordance with the provisions of article 7 of the Family Court Act.
Undisputed testimony contained in the following brief summary of the facts, not contradicted by the respondent, who did not take the stand, or his witnesses (his mother and 17-year-old sister), and based on the credible evidence of all the witnesses on direct, cross-examination and redirect, is substantially as follows:
The respondent was in the basement apartment when the police arrived in answer to a call about a dead man at the premises in question around 11:45 p.m, on the night of August 18, 1969. The police had been summoned by a friend of the respondent’s mother after respondent had told her that he had found a dead body at 218 West 141st Street. The respondent had also informed his mother and sister several hours earlier of this occurrence. At their request, respondent returned home a short time later, where the matter was discussed with his mother and older brother, who admonished him to remain in the house. The respondent refused and returned to the basement apartment where he was found by the police, along with the unidentified male, black, age 19, later identified as Charles H.; Edward B. the victim of the assault, who was asleep; and the deceased Frank H. in the rear bedroom. Edward B. had been hired by one Pearl H., the owner of the apartment building to be the superintendent, since her husband had died several months earlier. The respondent had been taking guitar lessons from Pearl H. ’s deceased husband. On the fateful day in question, Pearl H. had promised to give Joseph S. her husband’s guitar, which he was to pick up that evening when she returned from Brooklyn with it. Pearl EL, a cousin of the deceased, identified the body for the police.
The respondent and the other boy known as Charles EE. left the apartment around 12 midnight. When the policeman came out of the apartment at 2:30 a.m. on August 19, 1969 after completing his initial investigation, the respondent was sitting on the front stoop. Joseph S. approached the officer and said he wished to speak to him. The respondent then told the police officer voluntarily that he had seen two boys come into the apartment and *331 strangle the deceased with a rope around his neck. The respondent demonstrated by showing the officer the rope which was under a pile of clothes on the bed where the deceased lay face up. The patrolman asked the respondent to accompany him to the police station. He did so voluntarily and there told the detectives the same story. The respondent was not a suspect at this time and the patrolman was instructed to take Joseph S. to his home and advise his mother that he was a witness to a homicide.
Mrs. S. was informed and, accompanied by her daughter, was taken to the police station. William C., Charles H., and Pearl H. were also taken to the police station at this time. The police officer had a difficult time arousing Edward B., the victim of the assault, who was first taken to the emergency room of the hospital for treatment where he was found to have a head wound in the middle of the scalp, no hair at the place of the wound, and blood on his shirt. Edward B. was subsequently taken to the police station. In the course of the police investigation, the respondent told the officer that one Rodney R. had forced him to strangle the deceased, after telling him to only tighten the rope to scare the deceased. The police immediately checked their criminal files and found a picture of Rodney R., 24, male, Negro, which they showed to the respondent who stated that that was the man that forced him to strangle the deceased. The police immediately visited the home of Rodney R. where they were informed by Rodney’s mother that her son had been confined in Auburn State Prison for the past four and one-half months which the police verified.
When Edward B. first stepped into the police squad room on the second floor of the station he immediately and spontaneously identified the respondent who already was in the squad room with Charles H., the other young Negro found in the apartment upon the initial entry of the police. Edward B. saw the respondent and shouted “ That’s the boy that did it. Lock him up. There is the one who hit me right here — he is the one ”. Up until this point when the identification was made by Edward B., the respondent was still not a suspect, only a witness along with several others brought to the police station for the normal pretrial investigation.
Edward B., the victim of the assault, had testified on direct examination for the People that he was sitting in the kitchen of the basement apartment late in the evening of August 18, 1969 when the respondent entered and asked for Pearl H. Edward B. replied he did not know where Pearl H. was. The respondent then demanded the guitar or $5. Edward B. replied he knew nothing about the guitar or $5; whereupon the respond *332 ent angrily grabbed Edward B.’s cane which he found hanging over a closet door and started beating Edward B. on the top of the head with the curved part of the cane handle. Edward B. tried to grab the cane from the respondent as he was being hit. Edward B. testified the respondent had on a white T-shirt, white sneakers, and was “ as black as my shoe ”. Frank H., the deceased came into the room and asked the respondent ‘ ‘ Why are you hitting that man on the head? ’ ’ The respondent angrily turned to the deceased and said “ Get on out of here. You have nothing to do with this-you’re next! ” Edward B. testified further that he saw the respondent follow Frank H., the deceased, to his room, but heard nothing. Edward B. then went into the bathroom, wet his T-shirt, put it on his wounded head and lay down on his bed. His next remembrance was several hours later when the first patrolman at the scene, awakened him and William 0. and told them Frank H. was dead.
The respondent was brought into a small coffee room off the squad room on the second floor of the police station immediately after Edward B., the victim of the assault, had identified him. The petitioner said to him, “ You hear what they are saying. Why don’t you tell me what happened? ” According to the testimony of the detective and the patrolman first at the scene who also was present in the squad room at the interrogation, the respondent was told his rights and given the Miranda warnings which were read to him from a poster on the wall. These rulés recite that the accused has a right to remain silent; that any statement he does make may be used as evidence against him; that he has a right to the presence of an attorney either retained or appointed (Miranda v. Arizona, 384 U. S. 436). His mother was not present in the room, but was sitting outside in the squad room about 10 feet away. Her testimony was that she asked to go into the room with her son but was refused. She also testified she was never given the Miranda warnings nor did she at any time ever hear them being given to her son. The petitioner testified that the respondent, when asked if he understood each Miranda warning, replied or reacted with a shrug of his shoulders. The specific answer as to whether he wanted an attorney present, either paid or furnished, was a shrug of the shoulders. The respondent then proceeded to tell the detective he was down in the basement and had hit Edward B. on the head with a walking cane and placed the rope around the neck of Frank H. The petitioner then advised the respondent that he was going to write down the narrative he had just been told. The respondent signed the written confession after it had been read to him by the petitioner at around 6 or 7 a.m.
*333 After reviewing the statement from the respondent, the petitioner placed him under arrest for the assault on Edward B. and the death of Frank H., informed his mother, and took him to the Juvenile Term of the Family Court on the morning of August 19, 1969.
The defense has brought on six preliminary motions for criminal pretrial discovery and inspection. Four of these motions were disposed of by stipulation and agreement of the attorneys for both sides and are not presently at issue in the instant case. The two remaining motions are: 1. A motion to suppress the show-up identification. 2. A motion to suppress the written corn fession. Both of these motions have a direct bearing on the fact-finding hearing conducted hereunder to determine if the respondent is a juvenile delinquent.
The motion to suppress the show-up identification is denied. This motion is based on three famous unprecedented United States Supreme Court decisions which are usually referred to as Wade hearings. These cases held that a defendant and his counsel should be notified of any impending lineup in a police station (out-of-court identification procedure) and that counsel’s presence is a requisite to the conduct of a lineup, absent an intelligent waiver. (United States v. Wade, 388 U. S. 218; Gilbert v. California, 388 U. S. 263; Stovall v. Denno, 388 U. S. 293.)
In so ruling, the court noted that eyewitness identification can be one of the most unreliable forms of proof and may result in wrongful convictions. Any confrontation between suspect and witness is critical and counsel is required. (Stovall v. Denno, supra, p. 298.) Clearly, the court has taken a police investigatory tool and indorsed it with the full weight of the constitutional requirements and judicial review. (People v. Cohen, 60 Misc 2d 706.) In the case at bar, this was not a show-up nor was the respondent placed in any lineup. Hence, it was not required that he be represented by counsel. There was no formal lineup at the station house and no violations of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Nor were the police procedures deliberate or plcmned. Edward B. was not asked specifically to come to the police station to identify a suspect at the time of his immediate identification of the respondent when he first saw him in the squad room. There were several possible witnesses or persons there whom the police had come into contact with in the course of their normal police investigation which had not yet reached the accusatory stage or had focused upon one supsect. There was an instantaneous or spontaneous identification of the respondent by the victim of the assault, which had occurred a few hours earlier and within *334 the confines of a small room in a basement apartment with adequate lighting. This was no fleeting glimpse of an assaulter in a dimly lit back alley or corridor. There was ample visual observation made at the time the crime was committed for about 15 or 20 minutes, to impress the image upon Edward B.’s mind. The court also finds that the observation by the witness Edward B. was untainted by any improper or suggestive procedures employed by law enforcement officers. No photographs of the respondent were shown to Edward B. for identification purposes and hence, there was no impairment in this regard or detrimental effect upon the witness Edward B’s ability to make an identification of the respondent during the course of the trial. (People v. Bryant, 60 Misc 2d 808.) The respondent at the time of the police station confrontation was not in custody but had volunteered certain information to the police as to his presence at the scene of the crime (homicide) as a witness. As a matter of fact, the respondent was not deprived of his physical freedom when he first made the statement to the police that he was a witness to the homicide. There were no great numbers of police surrounding the house at this time. At the very beginning of the investigation when the respondent was in the basement apartment, his freedom of movement was in no way restrained and he could leave or remain. In short, at this point, there was no custodial interrogation. The police have a right in the course of their normal investigation to check all leads or information given to them. Neither Gault nor Miranda prohibits police investigations, as such, involving juveniles. What is prohibited is compulsory self incrimination. (Matter of Gault, 387 U. S. 1, p. 8; Miranda v. Arizona, supra; People v. Paulin, 33 A D 2d 105, 109.) Neither the police nor police counsel was confronted here with any inability of the assault victim to identify respondent from a police photograph or identify him as the perpetrator of the crime upon him, and thus withhold such a valuable disclosure from defense counsel. (People v. Ahmed, 20 N Y 2d 958; People v. Cohen, supra.) No issue of compulsory self incrimination is presented in this case. The respondent was not compelled to exhibit his person for observation by a prosecution witness prior to trial. It was perhaps fortuitous for the police that the confrontation between the respondent and Edward B. produced an immediate identification, plausible and perfectly proper evidence to use since no organized shape-up was involved. Even if the result for the police produced a suspect (the respondent), it was not produced by fraud, trick, ruse, artifice or cajolery. As was said in United States v. Wade (388 U. S. 218, 222, supra): “we have no doubt that compelling the *335 accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have.” Obviously, in the instant case, there was no lineup or even any compulsion of the accused to exhibit his person. All that happened was an instantaneous identification of the respondent by the assault victim. The right to require a person to exhibit himself in a lineup for identification purposes has been described as “ an incident of the State’s power to arrest, and a reasonable and justifiable aspect of the State’s custody resulting from arrest ” (United States v. Wade, supra, p. 260 [concurring opn. of Mr. Justice Fortas which the Chief Justice and Mr. Justice Douglas joined]; Hayes v. Waterfront Comm. of N. Y. Harbor, 60 Misc 2d 533).
The motion to suppress the show-up identification is denied because the police station procedures resulting in the identification of respondent, for the reasons above set forth were not violative of respondent’s constitutional rights nor did they taint in any way, manner or form the in-court identification of the respondent by the victim of the assault. Nor is there any violation against self incrimination under the Gault case. (Matter of Gault, supra; People v. Bryant, supra; People v. Ahmed, supra.)
The motion to suppress the written confession is granted.
In the instant case, fundamental principles of due process were violated insofar as the written confession obtained from him was concerned. The 13-year-old, who according to testimony by his mother was a little hard of hearing and could not read very well, was in a room by himself. His mother was not in the room when the written confession was taken from him after hours of sleeplessness, from midnight to 7 or 8 a.m., and, of course, with no counsel present. The right to counsel attaches when the prosecutorial process shifts from the investigatory to the accusatory stage and focuses on the accused as it did here when the respondent was identified by Edward B. as his assailant. (Miranda v. Arizona, supra; Thompson v. State, 451 P. 2d 704 [Nev.]; Haley v. Ohio, 332 U. S. 596, 600; Escobedo v. Illinois, 378 U. S. 478.)
Due process of law requires that the court scrutinize the police action with a finer comb when a child is involved. As was said in Haley v. Ohio, (supra, pp. 599-601): “ What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child — an easy victim of *336 the law — is before us, special care in scrutinizing the record must be used * * * that which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens * * * the age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law. But we are told that this boy was advised of his constitutional rights * * * and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen [in the instant case 13], without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. * * * They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which men fought and died to obtain.”
On the latter point, it was also said in Miranda v. Arizona, (supra, p. 458): “ We sometimes forget how long it has taken to establish the privilege against self-incrimination, the sources from which it came and the fervor with which it is defended. Its roots go back into ancient times.”
If the written confession and the circumstances under which it was obtained here were allowed to stand, we might as well lament with King Pyrrhus ‘ ‘ a few more victories like this and we áre all lost ”. Such “ Pyrrhic victories ” are abhorrent to our constitutional system of justice.
Furthermore and most important, there was no waiver of the respondent’s constitutional rights, voluntarily, Jcnoivingly and intelligently given here. The petitioner testified that the respondent shrugged his shoulders each time he was asked if he understood the rights. The respondent would have no way of knowing the consequences of his confession without the advice and aid of a mature judgment. (Gallegos v. Colorado, 370 U. S. 49, 54; Miranda v. Arizona, supra.)
Accordingly, the court grants the defense motion to suppress the written confession since there was no waiver voluntarily, intelligently and knowingly made here by the respondent and under the Miranda case (supra), there was no effective waiver of the respondent’s rights under his privilege against self *337 incrimination. Petitioner has also failed to sustain their heavy burden in this regard to demonstrate that the respondent knowingly, voluntarily and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel prior to any interrogation of him in custody as a suspect. A valid waiver will not be presumed simply from the silence of the individual after warnings are given by the police, or simply from the fact that a confession was obtained. The court in this case states the shrug of the shoulder by the respondent in answer to police query as to whether or not he wished an attorney present is a patently indifferent laconic response stemmmg from ignorance and is not an intelligent, knowing voluntary understanding rejection of the offer of counsel. Obviously, it is not the “ yes ” or “ rúo” answer rooted in even simple basic intelligence of a “ complete awareness ” of what is going on which a critical confrontation like this demands.
The fact that in these circumstances, particularly long hours of sleeplessness, the respondent eventually made his statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so, and is inconsistent with any notion of a voluntary relinquishment of the privilege. The requirements of warnings to be given by the police before in-custody interrogation of a suspect and the rule as to waiver of his rights are a fundamental with respect to the Fifth Amendment privilege against self incrimination and not simply a. preliminary ritual to existing methods of interrogation.
An interviewing law enforcement officer must exercise his ¡judgment in determining whether the individual interviewed waives his right to counsel; because of the constitutional basis of the right, the standard for waiver is necessarily high, and the ultimate responsibility for resolving this constitutional question lies with the courts. (Miranda v. Arizona, 384 U. S. 436, 479, 481, supra; Gallegos v. Colorado, 370 U. S. 49, 54, supra.)
In view of respondent’s physical and mental state at the time of the detective’s interrogation and the presence of many law enforcement officers in the police station, the testimony did not establish by a preponderance of the evidence that the respondent knowingly, intelligently and affirmatively waived his constitutional rights. (People v. Paulin, 33 A D 2d 105, 111, supra.)
There then remains the sole question for decision as to whether the respondent was a juvenile delinquent, based on other competent, material and relevant evidence as required by section 744 of the Family Court Act. If the inadmissible confession were the sole evidence of guilt, the juvenile delinquency petition as *338 to the homicide would fall of its own weight and have to be dismissed by this court. (Matter of ‘‘ Rutane ”, 37 Misc 2d 234; U. S. Const., 5th, 6th and 14th Amdts.)
The unceasing searchlight for the ascertainment of truth must now be focused on a careful analysis of the facts as to whether there is such other evidence and if so, whether further, the respondent did the acts based on a “ mere preponderance of the evidence. ’ ’ The rules of evidence for the protection of all parties in all trials at law apply in the Family Court but the quantum of weight of the evidence need only amount to the ‘ ‘ preponderance ” of the civil trial, not the “proof required ” beyond a “ reasonable doubt ”, to convict an adult criminal. (Matter of Samuel W., 24 N Y 2d 196; Matter of Ronny, 40 Misc 2d 194, 199; Family Ct. Act, § 744; N. Y. Const., art. VI, § 13.) These rules have “ an infinite capacity for mischief ” because Family Court proceedings relating to juveniles, such as juvenile delinquency proceedings, are not criminal in character, but constitutional safeguards must still be granted to juveniles. (Matter of De Gaglia, 54 Misc 2d 423; Matter of Knox, 53 Misc 2d 889; Matter of Gault, supra; Miranda v. Arizona, supra; Gilbert v. California, supra; Stovall v. Denno, supra.)
Apparently we have not yet reached that lofty and enlightened plateau where the same standards of evidence for proving guilt (“ beyond a reasonable doubt”) applicable to adult criminals are also applied to juveniles. The trumpets have already sounded in Gault (supra). Perhaps we are on our way to another star in our constitutional galaxy “ equal protection of the law”, or better still “equal justice under law”. Paraphrasing Justice Caedozo “ the last assault(s) upon the citidel ” of these remaining inequities for juveniles are beginning to rumble in the valleys and their thunderous din may soon reach the mountain top with a crashing crescendo and sweep the remaining barriers of proof of guilt that presently ‘ ‘ separate the men from the boys ” in serious criminal trouble. Would that we could say, legally, with a famous essayist! “Consistency— thou art a jewel ”.
Getting back to stark reality and our present New York law and applying these constitutional principles and present case law to the instant case, despite the hybrid or quantum or standard of proof required there was sufficient evidence besides the inadmissible confession to find an adjudication of juvenile delinquency. As indicated in my ruling denying the motion to suppress the show-up identification there is additional credible evidence that the act of assault as alleged has been committed. The respondent was properly identified by the victim *339 of the assault during the course of a pretrial investigative procedure where the respondent was a witness by his own admission to- a homicide at the initial threshold of the investigation. He was not a suspect in custody at the police station, but was there voluntarily with several other witnesses. He was not under arrest or the sole person under investigation. His presence and motive for being in the basement apartment where the crimes took place had been clearly established at the trial. The inclination and the- opportunity to commit the assault were present. In short, the respondent was 1 ‘ no stranger to the proceedings ’ ’. He lived in the neighborhood, had-been in the apartment several times for guitar lessons and was.told to come and pick up the guitar that evening. There is no credible testimony to the effect that Edward B. had been summoned to the police station for the purpose of identifying specifically his assailant. Edward B. was an eyewitness to the crime of assault upon him which lasted for several minutes under adequate lighting conditions. He was never unconscious during the entire course of the assault, despite its painful nature. An unconscious man does not walk to the bathroom, take off his shirt, wet it and place it on his wounded head. The victim’s court identification of the respondent had an independent origin of the police station confrontation. Edward B. had ample opportunity to observe the respondent at the time of the attack, there was no discrepancy between the police station identification and the respondent’s actual description; there was no identification, prior to the station house confrontation, of another person; there was no failure to identify the respondent on a prior occasion and there was no great lapse of time such as weeks or months between the alleged act and the police station identification (only a few hours). This test sufficiently distinguishes or purges any primary taint even if it had existed. (Wade v. United States, 388 U. S. 218, 241, supra; see, also, Wong Sun v. United States, 371 U. S. 471, 488; Hoffa v. United States, 385 U. S. 293, 309.) If anything, the coincidental, unforeseen, unpredicted, unrehearsed police station confrontation was harmless error, and that is not barred by Wade, Stovall or Denno and hence in derogation of respondent’s constitutional rights against self incrimination or his rights under the Sixth and Fourteenth Amendments. Only tortuous reasoning could so construe the. facts here. (Chapman v. California, 386 U. S. 18; People v. Di Gregario, 205 App. Div. 629; People v. Jaehne, 103 N. Y. 182; Matter of Houseworth, 53 Misc 2d 375.)
There was a prima facie case satisfactorily proved by the petitioner in this delinquency proceeding as far as the assault was *340 concerned. There was no going forward with the respondent’s defense evidence successfully; accordingly the prima facie finding must stand with finality, since the necessary “ quantum” of the evidence (preponderance) as to the assault has been proven on competent, material and relevant evidence independent of any statements about the assault made in the illegally obtained confession. (Family Ct. Act, § 744; Matter of Ronny, 40 Misc 2d 194, supra; Matter of Houseworth, supra.)
Furthermore, on the basis of the evidence in this case, there can be no doubt that Edward B., the victim of the assault, would have recognized his assailant at the time of trial even if the intervening police station confrontation and identification had not occurred (Wade v. United States, 388 U. S. 218, 242, supra). Consequently, there is not involved in the instant case any ‘ ‘ tainted fruit ’ ’ determination, since there was no primary illegality involved in the police station identification of the respondent by the victim of the assault.
The determination of juvenile delinquency as to the homicide is obviously much more difficult since there was no reliable eyewitness identification such as the victim in the assault. It must then be determined whether the inadmissible confession is the only evidence of the guilt of the respondent as to the homicide or whether there is other evidence standing by itself and independent of the confession which still furnish the required quantum of material, relevant and competent evidence and if so whether or not there is a preponderance of such evidence under section 744 of the Family Court Act. (Matter of “ Rutane ”, 37 Misc 2d 234, supra.)
On the basis of the credible evidence adduced at the trial, the respondent was in the basement apartment where he assaulted Edward B. and followed the deceased into his room where the latter had retreated after trying to help his friend, Edward B., from being “ caned ”. Edward B. testified on direct examination he saw the respondent follow the deceased into his room although he heard nothing. The respondent lied to the police when he tried to implicate one Bodney B. in the killing, since Bodney B. was proven to be in Auburn prison at the time of the commission of the crime. He freely admitted he was a witness to the homicide at the threshold of the investigation by the police and before he became a suspect. His activities in effect put a 1 ‘ rope around his own neck ’ ’. Nor was he helped in any appreciable degree by his mother and sister who took the stand in his behalf. Neither proved an alibi defense for the respondent showing his presence elsewhere than at the scene of the crime. Their testimony in many respects was inconsistent and *341 contradictory and would strain the credulity of even an illiterate backwoodsman to the breaking point. The mother for instance testified that the first time she knew of the crime was when her daughter awakened her at 3 a.m. at the request of the police to tell her that her son was a witness to a homicide. The daughter, however, testified that both she and her mother knew about the crime several hours earlier. The mother also testified that it was she who prevailed upon her friend to call the police to the apartment. The mother, sister and older brother were unable to restrain the respondent and keep him home with them. The sister testified that when she went to sleep around 12:30 a.m. on August 19, 1969 her mother, older brother and respondent had been discussing the entire case prior to that time.
At the initial police station confrontation between the victim of the assault, Edward B. and the respondent, the mother had testified that before Edward B. made the identification of the respondent he had asked her ‘ ‘ Is this the boy that plays the guitar? ” The mother answered “ Yes ”. Then says Edward B., “ he must be the one that hit me — that did it ”. No matter how far-fetched or ludicrous testimony is by a mother, anxious to help her son, this testimony is unbelievable, for to give such words their true meaning and dangerous import the mother would be implicating her own son.
Here again, on the basis of all of the foregoing, a prima facie case was satisfactorily proven in this delinquency proceeding by competent, relevant and material evidence including strong circumstantial evidence which is not illegal. On the basis therefore of “ totality of circumstances ” and the strong links forged in the chain of evidence against the respondent, there is ample evidence here apart from the inadmissible confession — evidence that is competent, relevant and material and meets the required quantum of proof (“ preponderance ”). (Family Ct. Act, § 744, subd. [b].)
The respondent also did not go forward successfully with defense evidence to rebut the prima facie case already established, and accordingly the finding made against him as to the homicide must stand with finality. (Matter of Ronny, supra, p. 194.)
The restrictions applicable are those required by the fundamental due process of law to fair treatment. The adjudication of juvenile delinquency is supported by a preponderance of the evidence, competent, relevant, material and nót bated on evidence which is illegal and insufficient as a matter of law (illegal lineup or shape-up and coerced confession). (U. S. Const. 5th, 6th, and 14th Amdts.; Miranda v. Arizona, supra; Gallegos v. *342 Colorado, supra; Family Ct. Act, § 744; Haley v. Ohio, supra; Escobedo v. Illinois, supra.)
The evidence of the underlying acts upon which the court has made its adjudication of juvenile delinquency is substantial and significant. On the merits the court finds that the petition has been established by a preponderance of the competent, material and relevant evidence. (Family Ct. Act, §§ 724, 744; Matter of Houseworth, 53 Misc 2d 375, supra; Matter of Ronny, 40 Misc 2d 194, supra; Matter of Gregory W., 19 N Y 2d 55.)
It is further found that the respondent’s acts, if committed by an adult would constitute the crimes of manslaughter in the first degree (Penal Law, § 125.20) and assault in the second degree (Penal Law, § 120.05). He is adjudicated a juvenile delinquent and the Probation Department is directed to make a predispositional hearing investigation.