In the Matter of Jesse Gene **ELMORE**.

No. 3977.

District of Columbia Court of Appeals.

Argued July 11, 1966.

Decided Aug. 31, 1966.

John E. Vanderstar and Edmund E. Fleming, Washington, D. C., for Jesse Gene Elmore.

David P. Sutton, Asst. Corporation Counsel, with whom Milton D. Korman, Acting Corporation Counsel, Hubert B. Pair, Acting Principal Asst. Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for the District of Columbia.

Before HOOD, Chief Judge, and QUINN and MYERS, Associate Judges.

MYERS, Associate Judge.

Jesse Gene Elmore appeals from a decision of the Juvenile Court of the District of Columbia finding him to be a delinquent and committing him to the custody of the Department of Public Welfare until his seventeenth birthday.

On November 17, 1965, Jesse's mother, with whom he was living, filed a petition in the Juvenile Court pursuant to D.C.Code § 11–1551(a) (1) (B) (Supp. V, 1966) representing that the boy, then aged thirteen, was habitually beyond her control in that

" * * * from September 24, 1965, until October 29, 1965, he has run away from home three times for a total of thirteen days. During the same period of time, he has kept late and unusual hours at home without. permission, practically every night. He has been illegally absent from school sixteen days this school year."

A motion by the boy's attorney requesting a jury trial was denied. Pending hearing on the petition, Jesse was committed to the Receiving Home. A later motion for his release into his father's custody[1] was granted.

At the hearing on the petition on January 4, 1966, evidence was introduced that during October 1965 Jesse had been absent from school without excuse for thirteen and a half days out of twenty-two school days. He had run away from home three times since September 24, 1965, remaining away on these occasions from four days to one week, at which times he would sleep in an upstairs hallway of the building where his mother lived, in vacant houses, in a neighbor's car, or, according to the boy, at a friend's house. During these periods he

---

1. Jesse's father and mother had been separated for many years.

would not notify his mother where he was. When at home he would keep late hours and disregard her efforts to control his behavior. His mother testified she always prepared his meals, bought him adequate clothing, and gave him money for lunch at school. On his own behalf, Jesse offered as an excuse for his failing to attend school that he had no shoes "worth wearing." He asserted his absences from home were caused by his mother's telling him on one occasion that he could no longer remain there as he had broken a window and, on another occasion, that she did not want him at home. Jesse admitted he kept late hours and was uncontrollable, as the petition charged, but stated he was afraid to come home because of his mother. Jesse's father testified the boy had never been a discipline problem for him during the few periods he had stayed with him. There was other testimony that Jesse was cooperative during the time at the Receiving Home and seemed interested in his school work.

At the conclusion of the testimony the trial judge ruled that Jesse was within the jurisdiction of the Juvenile Court because of his truancy from school, because of inadequate home supervision, and because he was habitually beyond the control of his mother. The case was continued for disposition on January 21, 1966, and Jesse was released to the custody of his father. At the disposition hearing on that date the probation officer reported that since the last hearing Jesse had not had after school supervision and had been arrested on January 6, 1966, after being found in a parked automobile when he should have been in school. As a result of this incident, the boy had been sent to the Receiving Home. The probation officer also stated that the boy had told him that he was unable to control his actions and could not adjust in the community without committing acts of delinquency and had expressed a wish to be placed in the Receiving Home until something could be worked out so he would have better supervision than he had with either of his parents.

Essentially adopting the suggestions of the probation officer, the trial court committed Jesse to the custody of the Department of Public Welfare until his seventeenth birthday, recommending that he be considered for placement in an institution where he could obtain psychotherapy and directing that the case be reviewed *ex parte* by the court about July 15, 1966, before the beginning of the school year, in order to determine what progress the boy had made.

In contesting the court's action, appellant's counsel charges principally that it was error to refuse to grant a jury trial; that the evidence failed to establish that Jesse was *habitually* beyond the control of his mother; and that the commitment of the boy to the custody of the Department of Public Welfare was arbitrary, capricious and without a rational basis.

I

D.C.Code § 16–2307 (Supp. V, 1966) provides that the Juvenile Court shall hear and determine all cases of children without a jury "unless a jury is demanded by the child, his parent, guardian, or the court." Counsel for appellant contends that this section must be read to guarantee the right of trial by jury upon demand by any of the parties named, regardless of whether the juvenile proceedings are denominated civil or quasi-criminal. We do not find that the authorities in this jurisdiction or elsewhere support this contention.

A delinquent child is neither considered nor treated as a criminal but as a person needing guidance, care and protection. Thomas v. United States, 74 App.D.C. 167, 169–170, 121 F.2d 905, 907–908 (1941). The safeguards which surround him do not inherently derive from the Constitution but from the social welfare philosophy which forms the historical background of the Juvenile Court Act, here and as similarly enacted elsewhere, as recently enunciated in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). See also Pee v. United States, 107 U.S.App.D.C. 47,

274 F.2d 556 (1959). The investigation and court proceedings involving the determination of a child's delinquency are directed to the status and needs of the child, and the disposition thereof has as its goal not punishment but the rehabilitation and restoration of the child to useful citizenship. 100 A.L.R.2d 1241, 1242 (1965). The end result is that a child should not be labeled a criminal, he is not punished as a criminal, and the proceedings against him should be far removed from the characteristics of a criminal trial.

■ In considering D.C.Code (1951) § 11–915, predecessor to the present § 16–2307, we ruled in In re Lambert,[2] a case involving a parent's demand for a jury trial in a dependency proceeding, that this section preserved the right to a trial by jury in cases involving children only where such constitutional right had theretofore existed and did not extend such right to custody cases—civil equity proceedings where such right did not traditionally exist. Our decision in this case. was upheld by the United States Court of Appeals which, after a review of the theory and legislative history behind the statute, held that

"In the light of the clear purpose of the statute, and in the additional light of the legislative history, we cannot * * hold [that appellant was entitled to a jury trial]. We think that the right to jury trial upon demand was intended to be granted only in those cases in which jury trials had theretofore been customary." [3]

The reasoning in *Lambert* is applicable here. It has not been shown in the instant case that the right to trial by jury was customary in a proceeding of the nature of the one before us[4]—essentially a custody hearing, where the issue was directed to whether the child was habitually beyond the control of his mother. We hold that the trial judge did not err in denying appellant's request for a jury trial.

## II

Appellant makes a two-pronged attack on the finding of the trial judge that the child was "habitually" beyond control: First, he contends that, as used in § 11–1551, the word "habitually" means more than just "occasionally" or "frequently"; and, Second, that a period of five weeks was an insufficient length of time upon which to make a finding that the boy was "habitually" beyond control. He maintains that behavior to be characterized as habitual must be close to ungovernable, or uncontrollable, perhaps even compulsive. It is his position that the child was found to be "habitually" beyond control on evidence that showed only "frequent" rejection of parental control.

■ ■ The word "habitually" as used in our juvenile statute has never been defined by Congress nor interpreted by this court. We feel it does not possess a criminal connotation—does not necessarily mean entirely, totally, continuously, or exclusively—but suggests rather customary conduct, the result of frequent practice or habit acquired

---

2. D.C.Mun.App., 86 A.2d 411 (1952).

3. In re Lambert, 92 U.S.App.D.C. 104, 107, 203 F.2d 607, 610 (1953).

4. See Lindsay v. Lindsay, 257 Ill. 328, 100 N.E. 892, 894, 45 L.R.A.,N.S., 908 (1913), where the court stated:
   "The prerogative of the state, arising out of its power and duty, as parens patriae, to protect the interests of in-

fants, has always been exercised by courts of chancery."
In answering objections similar to the ones made before us, the court quoted with approval the language of an earlier case holding that a juvenile court proceeding is "not a proceeding according to the course of the common law in which the right of a trial by jury is guaranteed, but the proceeding is a statutory one * * * "

over a period of time. But even under appellant's interpretation of the word, we believe the record reflects a *habitual* course of conduct—habitually truant from school and home and habitually beyond the control of his parents. And if the juvenile's own assessment of his pattern of conduct in the community can be accepted, his aberrations were steady, recurring and even compulsive. In his own opinion, he needed help and supervision.

We believe, too, that an appraisal of the child's conduct over the thirty-five day period covered by the petition was an adequate length of time upon which to conclude that the child was habitually beyond control. This conclusion is reinforced by the fact that just two days after the first hearing—after he had been placed with his father as an alternative to going to the Receiving Home pending final disposition of the case—he was found in a parked automobile when he should have been in school.[5]

We therefore affirm the trial court in its finding that the child was "habitually" beyond control.

### III

Finally, appellant attacks the disposition of the case on the grounds that he was denied a full and fair hearing and that no finding was made that "his welfare and the safety and protection of the public cannot be adequately safeguarded without [his] removal" from the custody of his parents. D. C.Code § 16–2308(a) (Supp. V, 1966).

In support of his contention that the boy was not afforded a full and fair hearing, counsel asserts that the probation officer's narrative report to the trial judge defeated the right to cross-examination and contained many unsubstantiated and conflicting remarks. We find no merit to this argument. At both hearings counsel then representing appellant had opportunity to cross-examine all witnesses, including the probation officer, and to present his reasons why commitment to the Department of Public Welfare was not valid or for the best interests and welfare of the child and of society. The comments of the probation officer which are here objected to were but a fraction of his testimony and presented but a small portion of the overall picture of the child's life. Whatever variations there may have been were in our judgment immaterial and not determinative of the ultimate disposition of the case.[6]

The court had before it a child of only thirteen, unable to help himself and in tragic need of supervision and guidance, which unfortunately his parents were unable to provide. The trend of his life forebode of serious consequences to society and to himself if his pattern of conduct were not corrected. The court's order was fashioned to do precisely that. The trial judge was faced with three alternatives: The boy could be returned to his mother's custody. This possible solution was negated by her own admitted inability to control him. He could be placed in the custody of his father. However, it was evident that when with his father appellant continued his pattern of absences from school and home and did not

---

5. He was truant on this occasion despite the fact that at the conclusion of the hearing on January 4, 1966, the trial judge had painstakingly counseled him on his responsibility to attend school, had obtained assurance from the boy that he would go to school, had discussed with him his plans for occupying himself during the two hours after school when he would have no adult supervision, and had ascertained from the child that he had appropriate clothing to wear to school.

6. In juvenile proceedings, the standard to be applied in determining involvement or jurisdiction is not proof beyond a reasonable doubt, but proof by a preponderance of evidence. In re Bigesby, D.C.App., 202 A.2d 785 (1964). Cf. Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (1961); Pee v. United States, 107 U.S.App.D.C. 47, 274 F.2d 556 (1959).

receive the much-needed supervision. He could be placed under the supervision of the Department of Public Welfare. Every facet of the child's life persuades us, as it did the trial judge, that, absent any proposal for a better solution, both his welfare and the protection of the public were best safeguarded by his placement with the Department of Public Welfare where he would have supervision and the prospect of psychiatric care and guidance.

Accordingly, we rule, under the facts and applicable law, that the judgment of the Juvenile Court and the commitment of Jesse Gene Elmore to the Department of Public Welfare until his seventeenth birthday are

Affirmed.