Ulisis **NIEVES**, Plaintiff,

v.

The **UNITED STATES** of America, **Defendant.**

No. 67 Civ. 2399.

United States District Court
S. D. New York.

March 5, 1968.

Theodore Krieger, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty. for the Southern Dist. of New York, by David Paget, and Lawrence W. Schilling, Asst. U. S. Attys., for defendant.

Before ANDERSON, Circuit Judge, and MacMAHON and TYLER, District Judges.

## OPINION

TYLER, District Judge.

In In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the United States Supreme Court was faced with a constitutional attack on the juvenile proceedings held in an Arizona state court, which, so far as one can determine from reading *Gault,* were markedly different from juvenile proceedings conducted in this court under currently applicable federal law. In actuality, juvenile procedures in this court for a number of years have been the equivalent of typical adult criminal proceedings in every substantial respect save two: there is no indictment by grand jury and no trial by petit jury. In reliance upon the reasoning of *Gault,* plaintiff and his counsel have caused a three-judge panel to be convened to determine whether the absence of a petit jury, as mandated by the Federal Juvenile Delinquency Act ("FJDA"), 18 U.S.C. § 5033 (1964), is at variance with the demands of the Sixth Amendment of our Constitution. 28 U.S.C. § 2282 (1964).

### I.

Ulisis Nieves was arrested for an alleged violation of the marijuana laws, 26 U.S.C. § 4742(a) (1964), on October 25, 1966. He was then only 16 years old and therefore a juvenile, as defined by the FJDA. 18 U.S.C. § 5031 (1964). On the following day he was arraigned before a United States Commissioner and assigned counsel. Pending further proceedings, he was released, without bail, in the custody of his mother. Thereafter, the government furnished him with a copy of a proposed information charging him with an act of juvenile delinquency.

Until that time, Nieves was subject to the criminal rather than the juvenile jurisdiction of this court, although no indictment had been handed down and no formal information had been filed. Implicit in the structure of the FJDA is the rule that all juveniles alleged to have committed acts in violation of the laws of the United States are preliminarily subject to normal criminal proceedings, and the Attorney General may "in his discretion" preclude resort to FJDA proceedings by directing that the juvenile be tried as an adult. 18 U.S.C. § 5032 (1964). Whenever the Attorney General does not so direct, however, the juvenile has the choice between a normal adult trial and the advantages of the FJDA proceedings. Nevertheless, in order to gain the privileges accorded by the Act, the juvenile must consent to be proceeded against as a juvenile delinquent, and this consent is "deemed a waiver of a trial by jury." 18 U.S.C. § 5033 (1964).[1]

On April 26, 1967, Nieves appeared in open court and, in the presence of his counsel, he executed the necessary consent form. The consent recited that the juvenile proceedings would be without jury. Thereupon he pleaded not guilty to the charge of juvenile delinquency.

The following month *Gault* was decided by the Supreme Court. In rapid succession, Nieves' original attorney withdrew, and this court appointed his present counsel, who took three steps to obtain a jury trial in Nieves' juvenile delinquency proceeding: (1) he filed a motion in that proceeding to withdraw Nieves' consent to trial without a jury; (2) he filed a complaint in this action seeking an injunction to prevent the government from trying Nieves without a jury and asking for a declaratory judgment that 18 U.S.C. § 5033 (1964) is unconstitutional, insofar as it provides for mandatory waiver of trial by jury; and (3) he filed a motion in this action requesting the convention of a three-judge district court.

---

1. This procedure should be compared with that followed in many states and the District of Columbia. In those jurisdictions, a separate juvenile court is constituted and given preliminary jurisdiction over all juvenile delinquents. The juvenile court judge is then given the power to waive this jurisdiction in certain specified circumstances, enabling the government to institute normal criminal proceedings against the defendant. See Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

With the consent of counsel and the approval of Judge Tyler, who heard the motion to convene the panel, proceedings in the juvenile delinquency case have been temporarily suspended. Upon consent of the government, the motion for convention of a three-judge panel was granted.

Crucial to plaintiff's argument is the proposition that notwithstanding his youth, the Sixth Amendment guarantees him a trial by jury before he can be incarcerated for the crime of selling marijuana. Nevertheless, if he chooses to assert his constitutional right, he risks possible imprisonment for up to twenty years, 26 U.S.C. § 7237(b) (1964), as well as the threat of the stigma which attaches to a criminal conviction. To induce him to waive his constitutional right, Congress has offered him the alternative of a maximum commitment until the age of 21, as well as the freedom from the label of a common criminal, if he chooses the procedures under the FJDA. See 18 U.S.C. §§ 5032, 5034 (1964). Plaintiff contends that in enacting the FJDA, Congress has fashioned a statutory scheme which extracts a waiver of his constitutionally guaranteed right to a jury trial in an impermissible manner and punishes him if he elects to assert it.

Nieves further urges that, notwithstanding our decision on the above issues, *Gault* must be read as granting a juvenile the right to a petit jury in all FJDA cases.

We agree with plaintiff's basic contention and hold that (1) his waiver of jury trial cannot be permitted to stand, and (2) the Attorney General cannot proceed against him as a juvenile without affording him his constitutionally protected jury trial.

## II.

As is so often the case where three-judge district court panels are involved, questions of jurisdiction abound. Although a number of these have been eliminated because the government has consented to this procedure, certain other questions cannot be obviated by its consent. Primary among them are the subject matter jurisdiction requirement and mootness.

Plaintiff, in his moving papers, rested jurisdiction upon 28 U.S.C. § 2282 (1964), the three-judge panel statute. It is settled law, however, that some independent source of jurisdiction must be relied upon for a statutory court to have the requisite subject matter jurisdiction. See Jacobs v. Tawes, 250 F.2d 611 (4th Cir. 1957); cf. Lion Mfg. Corp. v. Kennedy, 117 U.S.App.D.C. 367, 330 F.2d 833 (1964). But cf. Reed Enterprises v. Corcoran, 122 U.S.App.D.C. 387, 354 F.2d 519 (1965). In this case it is supplied by 18 U.S.C. § 5033 (1964), the Congressional grant of jurisdiction of juvenile proceedings to the district courts. Jurisdiction under the general federal question provision, 28 U.S.C. § 1331 (1964), seems absent because plaintiff has failed to allege that the amount in controversy exceeds the required $10,000.

As for mootness, the government could argue, as it has not chosen to do, that the question is not justiciable because the matter was resolved by Nieves' voluntary waiver of his right to jury trial in the consent executed April 26, 1967. We have concluded, however, that Nieves' consent to FJDA proceedings did not bar this action on the theory of mootness. Last term's Supreme Court decision of Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed. 2d 562 (1967) dictates this result. In that case, the Court held that under federal standards, a New Jersey policeman could not be deemed to have waived his privilege against self-incrimination when he testified after being warned that a failure to do so would subject him to removal from office. Though the officer incriminated himself at the investigation and did not make his objection until a subsequent trial, the Supreme Court ruled his statements were involuntary and inadmissible, since they were the product of the coercion created by the "rock or whirlpool" choice presented to the de-

fendant. Although the policeman had initially succumbed to compulsion, he apparently preserved his objection by raising it at "the earliest possible point" —the trial stage. Since we hold hereinafter that Nieves was presented with the same kind of impermissible coercion as the defendant in *Garrity* and he has objected at an even earlier stage, we follow the rationale of that decision and conclude that Nieves never voluntarily and effectively waived his right to a jury trial.

In addition, in light of the fact that *Gault* was not decided until after Nieves' purported waiver, we cannot say that his action was "an intentional relinquishment or abandonment of a known right or privilege". Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); see Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).[2]

■ Though it is conceivable that in some view of the facts of this case a single judge could properly rule on Nieves' constitutional claim, we feel that the wiser course is a determination by a statutory panel. While a single district judge is without power to act in a case requiring three judges, the opposite is not true. Swift & Co. v. Wickham, 230 F. Supp. 398, 410 (S.D.N.Y.1964), appeal dismissed, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). We note that the only consequence of an erroneous retention of jurisdiction by this panel is some uncertainty as to where appellate review should be had. Ibid. Following the practice approved of by the Supreme Court in its review of the *Swift* case, "out of abundant caution" we formally certify the obvious fact that Judge Tyler has reached the same conclusion as the entire panel.

### III.

■ Aside and apart from any statutory rights Nieves would have in his juvenile delinquency proceeding, it is uncontroverted that if he chose to be prosecuted under the criminal statute he allegedly violated, he would be protected by the full panoply of constitutional rights available to adults. "[T]he Bill of Rights applies to every individual within the territorial jurisdiction of the United States, irrespective of age. The Constitution contains no age limits." Trimble v. Stone, 187 F.Supp. 483, 486 (D.D.C.1960). The Supreme Court is in apparent agreement, noting recently that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." In re Gault, supra, 387 U.S. at 13, 87 S.Ct. at 1436.

Justice Fortas of the Supreme Court has outlined the evolution of a juvenile's rights in a recent law review article. Fortas, Equal Rights—For Whom?, 42 N.Y.U.L.Rev. 401 (1967). At common law, minors accused of having committed crimes were treated in the same fashion as adults. The very young, those under seven, were irrebuttably presumed to be incapable of forming the requisite criminal intent. Above that age, however, juveniles were often tried and convicted as adults. Until the early part of the twentieth century, they were given the same legal protections and the same punishments as their elders. See In re Gault, supra at 79–80, 87 S.Ct. 1428 (dissenting opinion); Antieau, Constitutional Rights in Juvenile Courts, 46 Cornell L.Q. 387, 401 (1961); see generally, President's Commission on Law Enforcement and Administration of Justice, Task Force Report on Juvenile Delinquency and Youth Crime 2–4 (1967).

Then a wave of reform swept the nation. State legislators recoiled over the barbarity of sending callow youths to penitentiaries for lengthy terms. New procedures were adopted to shield them from the unpleasantness associated with adult prosecutions.

---

**2.** If our view of the applicability of Garrity is incorrect and Nieves is considered to have waived his rights, fairness dictates that we permit him to withdraw his waiver in light of our decision on the merits of his claim. Cf. Murphy v. Waterfront Comm., 378 U.S. 52, 79–80, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

"There were many consequences of this reform, one of which was that juveniles became nonpersons in the sense that the constitutional guarantees of jury trial, right to counsel, right to confront accusers, right to bail, privilege against self-incrimination and so forth have not been available to them." Fortas, Equal Rights—For Whom?, supra at 406.

When these new procedures were instituted by the states, conflict with the federal constitution was negligible because in that era few, if any, federally protected rights had been "incorporated" into the Fourteenth Amendment. See Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937); cf. Barron v. Mayor of Baltimore, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). Similarly, federal juvenile proceedings did no violence to the United States Constitution, since juvenile offenders were prosecuted in our courts in the same manner as adults until the passage of the FJDA in 1938. See United States v. Borders, 154 F.Supp. 214 (N.D.Ala.1957), aff'd, 256 F.2d 458 (5th Cir. 1958). The legislative history of the FJDA indicates the general awareness of the applicability of the right to jury trial to the prosecution of youths. Attorney General Cummings, sponsor of the Act, directed identical letters to the members of the House and Senate Committees studying the Act, stating:

"[T]he consent of the juvenile * * * is to be required to a prosecution for juvenile delinquency under the Act. * * * It has been held that a minor may waive the constitutional right to a trial by jury in the same manner as adults." H.R.Rep. No. 2617, 75th Cong., 3d Sess., June 7, 1938 and S.Rep. No. 1989, 75th Cong., 3d Sess., June 6, 1938.

Congress thereupon retained a modified right to jury trial for juveniles by giving them the opportunity to elect normal criminal prosecution as an alternative to FDJA proceedings. See 18 U.S.C. § 5032 (1964).

Since the adoption of the Act, the federal judiciary has reaffirmed the fact that the Bill of Rights is not the exclusive province of adults. Just last term the Supreme Court, in *Gault*, held that the Fifth Amendment privilege against self-incrimination, made applicable to the states by the Fourteenth Amendment, had to be accorded to juveniles. Similarly, the Fifth Amendment right to a grand jury, United States v. Reef, 268 F.Supp. 1015 (D.Colo.1967), the Fifth Amendment protection against double jeopardy, United States v. Dickerson, 168 F.Supp. 899 (D.D.C.1958), reversed on other grounds, 106 U.S.App.D.C. 221, 271 F.2d 487 (1959), the Sixth Amendment right to counsel, In re Poff, 135 F.Supp. 224 (D.D.C.1955) and the Eighth Amendment right to bail, Trimble v. Stone, supra, have all been held to be applicable to juveniles. Finally, United States ex rel. Stinnett v. Hegstrom, 178 F.Supp. 17 (D.Conn.1959), holds that a juvenile cannot be incarcerated in an adult prison without first having been tried and convicted as an adult with all constitutional rights available, including the Sixth Amendment right to a jury trial.[3] It should be emphasized that all

---

3. In re Lambert, 86 A.2d 411 (D.C.Mun. Ct.App.1952), aff'd, 92 U.S.App.D.C. 104, 203 F.2d 607 (1953), is one federal case occasionally cited for the proposition that juveniles are not entitled to the Sixth Amendment right to jury trial. As clearly indicated by the decision on appeal, however, that case involved a custody dispute over two children, aged two and three. The Court of Appeals for the District of Columbia construed the D.C. Juvenile Court Act of 1938 as granting a jury trial only in juvenile delinquency proceedings and not in custody proceedings.

The court's comments on the legislative history of the D.C. Act are noteworthy. It found that "in its report to the House the Committee said that jury trial was provided on demand 'due to the fact that the District of Columbia is a Federal jurisdiction'" and concluded that "this was an obvious reference to the requirement of the Federal Constitution that jury trial be available in all 'criminal prosecutions'." 203 F.2d at 609–10.

these opinions have reaffirmed the constitutional rights of juveniles by direct application of the Bill of Rights and not by a process of incorporation from the amorphous Fifth Amendment due process standard. That juveniles are shielded by the same ancient rights as their elders should not seem surprising. The Supreme Court has stated that

> "The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefits of a written Constitution and undermine the basis of our Government. * * * [W]e have no authority, or inclination, to read exceptions into it which are not there." Reid v. Covert, 354 U.S. 1, 14, 77 S.Ct. 1222, 1229, 1 L.Ed.2d 1148 (1957).

Congress, when it passed the FJDA, undoubtedly had the highest motives. Numerous statutory rights were accorded juveniles who consented to FJDA procedures, with the twofold purpose of erasing the stigma of a criminal conviction and rehabilitating the wayward juvenile rather than punishing him. With the first goal in mind, Congress provided that if the juvenile consented to FJDA proceedings and the Attorney General did not object, no "criminal prosecution" would be instituted for the alleged violation. 18 U.S.C. § 5032 (1964). Thus, a youth found guilty in a FJDA proceeding is not considered a criminal, and the record cannot be used to impeach his testimony at a later date on the theory of prior convictions. See Brown v. United States, 119 U.S.App.D.C. 203, 338 F.2d 543, 547 (1964). Similarly, he would appear to undergo no loss of civil rights, as he would if he were a convicted felon. Cf. N.Y. Election Law, McKinney's Consol.Laws, c. 17, § 152(4); Green v. Board of Elections, 259 F.Supp. 290 (S.D.N.Y.1966) (voting rights); 28 U.S.C. § 1861(1) (1964) (competence to serve as juror). In addition, Congress attempted to protect youths from the publicity inherent in a court trial by providing that FJDA proceedings could be held "in chambers". 18 U.S.C. § 5033 (1964).

Rehabilitation rather than punishment is envisioned for youths sentenced under the Act. The juvenile is generally sent to a training school or foster home. See 18 U.S.C. § 5034 (1964). It has been held that sending him to a penitentiary would violate his constitutional rights. See, e. g., United States ex rel. Stinnett v. Hegstrom, supra; White v. Reid, 126 F.Supp. 867 (D.D.C.1954). But see Sonnenberg v. Markley, 289 F.2d 126 (7th Cir. 1961); United States v. McCoy, 150 F.Supp. 237 (M.D.Pa.1957). Commitment cannot exceed the term which might have been imposed on the juvenile had he been criminally tried and convicted. 18 U.S.C. § 5034 (1964). Nor can it extend beyond his minority. Ibid. Moreover, if a juvenile is detained in jail pending FJDA proceedings, he must be kept apart from adults if separate facilities are available. 18 U.S.C. § 5035 (1964).

On the other hand, the criminal penalty for violation of 26 U.S.C. § 4742(a) (1964), the law which Nieves is alleged to have violated, is imprisonment for not less than 5 or more than 20 years, or a fine of up to $20,000, or both. 26 U.S.C. § 7237(b) (1964). Notwithstanding a recent amendment making marijuana offenders eligible for parole, a sentencing judge still has no power to suspend sentence or grant probation, even in the case of a first offender. 26 U.S.C.A. § 7237 (d) (1967). In addition to the stigma from his resultant criminal record, one found guilty of violating Section 4742(a) faces the prospect of a 10 to 40 year sentence if he ever again violates any of a number of narcotics or marijuana laws. See 26 U.S.C. § 7237(b), (c) (1964).

The alternatives presented exert strong pressure on any juvenile defendant to waive his Sixth Amendment right. Though he may well prefer to have the trier of facts be a jury of twelve, the cost of such an election is very nearly prohibitive. Such a Hobson's choice is not without parallel in other areas of

criminal procedure. In recent years, it has been repeatedly held that procedural alternatives cannot be so structured so as to (1) penalize the assertion of rights guaranteed by the Bill of Rights, or (2) coerce the waiver of those rights. See, e. g., Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); Garrity v. New Jersey, supra; Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); United States v. Jackson, 262 F.Supp. 716 (D.Conn.), prob. juris. noted, 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 989 (1967).

These two rules are merely different statements of the following fundamental doctrine: In many cases it is constitutionally impermissible to require an individual to choose between the assertion of a right constitutionally guaranteed and the waiver of that right. Where a reward is held out. to an individual for the waiver of a constitutional right, or a greater threat posed for choosing to assert it, any waiver may be said to have been extracted in an impermissible manner. If the individual asserts his right and thereby encounters harsher treatment than he would otherwise, such treatment may be struck down as a penalty. But see, e. g., Nelson v. County of Los Angeles, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1960); Gardner v. Broderick, 20 N.Y.2d 227, 282 N.Y.S.2d 487, 229 N.E.2d 184 (1967), cert. granted, 390 U.S. 918, 88 S.Ct. 848, 19 L.Ed.2d 978 (1968) (No. 635); Laboy v. New Jersey, 266 F.Supp. 581 (D.N.J.1967).

The decisions of the Supreme Court all have involved the Fifth Amendment privilege against self-incrimination. *Garrity* and *Spevack* dealt with the choice presented to policemen and a lawyer of waiving their privilege or losing their livelihood. *Griffin* concerned the choice presented to a defendant of waiving his privilege or having the court and prosecutor comment to the jury that his failure to testify implied guilt. In each case, the Court held that the alternatives presented an impermissible choice.

This double-edged problem has also arisen in cases involving the right of trial by jury. The kidnapping statute, 18 U.S.C. § 1201(a) (1964), provides that only a jury may recommend the death sentence in cases where the person kidnapped is returned in a harmed condition. In United States v. Jackson, supra, the defendant was faced with the choice between exercising his right to jury trial and accepting the possibility of a death sentence, and waiving his right and either pleading guilty or consenting to non-jury proceedings. If he chose the latter, he could thereby foreclose the threat of death. Relying on Griffin v. California, supra, the court held the statute unconstitutional in that it "penalized and made costly" the Sixth Amendment right to jury trial.[4]

The choice offered Nieves is no less coercive. The FJDA penalizes and makes costly the assertion of his Sixth Amendment right to jury trial; therefore, it is unconstitutional to the extent that it requires a juvenile defendant to waive his right to jury trial in order to be proceeded against under the Act.

It is urged by the government that the impetus for relinquishment of the right to jury trial in *Jackson* was the threat of a penalty affirmatively imposed by statute for the exercise of a constitutional right, whereas the impetus for relinquishment of the right under the FJDA is the desire of a juvenile to reap the benefits conferred by that Act. We find this to be an illusory distinction. The fact is that, whether by means of forfeiting a reward or by incurring a

---

4. Cf. Whitus v. Balkcom, 333 F.2d 496 (5th Cir.), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964), where the Fifth Circuit held that in a state criminal prosecution, a Negro had not waived his right to an impartially selected jury when his lawyer failed to attack the composition of the venire for

fear of invoking the hostility of the petit jury. "The constitutional vice is not just the exclusion of Negroes from juries. It is also the State's requiring Negro defendants to choose between an unfairly constituted jury and a prejudicial jury." Id. at 499.

penalty, a demand for jury trial can result in a more severe punishment than could be imposed following a waiver.

It is also suggested that *Jackson* is distinguishable on the ground that the choice there presented was possibly between life and death, whereas the harshest penalty Nieves could receive if he wanted a jury would be 20 years imprisonment. The Supreme Court has recognized, however, that prospective penalties far less overwhelming than death can be unconstitutionally coercive. Thus, in Spevack v. Klein, supra, the threat of disbarment, used by New York State to cause lawyers to testify, was held to be an impermissible penalty. The Court noted that the term "penalty" in this context included any sanction which made the assertion of the Fifth Amendment privilege costly. Id., 385 U.S. at 515, 87 S.Ct. 625.

The *Jackson* decision has not gone unquestioned. Laboy v. New Jersey, supra, involved a state prisoner's contention, by way of a petition for habeas corpus relief, that the New Jersey murder statute under which he was convicted was unconstitutional for the reasons set forth in *Jackson*. The record indicated that the alternatives facing Laboy had exerted strong pressure on him. He had two apparent mental breakdowns and one attempted suicide prior to his decision to waive his jury trial. Further, Laboy, unlike Jackson, could not contest his guilt in a non-jury trial, since none was possible under New Jersey procedures. Although it could have distinguished *Jackson* on the ground that precedent did not indicate that the Constitution guaranteed a jury trial to a state defendant, the court instead, by dictum, interposed a balancing test as a bar to literal application of the *Jackson* rationale. Denominating the choice of alternatives as only an "obstacle" to the exercise of the right to jury trial, *Laboy* reasoned that the New Jersey legislature could extract waivers of that right so long as the "degree of the obstacle" did not outweigh "the value of the policy" which it implemented. Laboy v. New Jersey, supra, 266 F.Supp. at 585. Finding the policy there to benefit the relator in that a single judge could not impose the death penalty, the court concluded that the procedure was constitutionally permissible.

■ We doubt that erosion of a defendant's fundamental rights in criminal proceedings can be sanctioned under the rubric of a balancing test. Indeed, we believe that the Supreme Court in *Garrity* and *Griffin* laid that theory to rest. Whether the Constitution denominates the protection as a right or a privilege, legislatures by means of threat of penalty or promise of reward cannot punish a defendant for exercising his constitutional protections or pressure him into waiving them.

Finally, it has been suggested that the reasoning of *Jackson* is erroneous in light of Singer v. United States, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965). See Comment, 12 N.Y.L.F. 688, 694–95 (1966). In *Singer* the Supreme Court held that a defendant has no absolute right to waive a jury trial. But if the federal government, under Criminal Rule 23(a), can always force a defendant to take a jury trial, then it could be argued that Jackson was not faced with an impermissible choice. The government could preclude the non-jury alternative and compel him to run the risk of the harsher penalty that goes with the jury trial.[5]

By a parity of reasoning, it can be argued that Nieves was not faced with an impermissible choice in that the government had the apparent right under the statute to order him to undergo adult proceedings. 18 U.S.C. § 5032 (1964).

The short answer to this is that while a juvenile has no absolute right to FJDA

---

5. The District Court deciding *Jackson* skirted this issue, citing *Singer* and noting that it "need not determine * * * whether defendant effectively may waive jury trial absent consent of the government and approval of the court." United States v. Jackson, supra at 717 n. 4.

procedures, see, e. g., Ramirez v. United States, 238 F.Supp. 763 (S.D.N.Y.1965) (dictum); United States v. Verra, 203 F.Supp. 87 (S.D.N.Y.1962), in the instant case the government elected to give Nieves the benefit of those procedures prior to his execution of the waiver on April 26, 1967. Nieves' problem, thus, was not hypothetical; he was clearly faced with an impermissible choice.

Furthermore, as we read the governing statute,[6] the onus is always placed upon the Attorney General and his assistants to make a decision whether to prosecute a youth as an adult before the latter is called upon to choose his forum. The statute explicitly states that a juvenile is entitled to FJDA proceedings "unless the Attorney General, in his discretion, *has expressly directed otherwise.*" 18 U.S.C. § 5032 (1964). (Emphasis added.) We note that the government rarely demands that a juvenile be prosecuted as an adult; thus, the vast majority of juveniles charged in the federal courts with violations of federal criminal law, including Nieves, are faced with the same impermissible choice that faced Griffin, Garrity and Spevack. Regardless of the applicability of *Singer* to *Jackson,* under the circumstances of this case, *Singer* seems wholly inapplicable.[7]

### IV.

While we have concluded that the FJDA is in part unconstitutional with only passing reference to the landmark decision of In re Gault, supra, we believe that that opinion also supports Nieves' position. *Gault* marked the first time that the Supreme Court held various pro-cedural safeguards to be constitutionally required in state juvenile court proceedings, namely the rights to counsel, to confrontation and to notice of the charge, and the privilege against self-incrimination. Since *Gault* arose out of a state proceeding and the Bill of Rights therefore was not directly applicable, the Court spoke often in terms of due process and fundamental fairness in finding these protections. This has caused some confusion, in that it is not altogether clear whether the Court was referring to the same due process standards of the Fourteenth Amendment as are required for state criminal prosecutions, see, e. g., Palko v. State of Connecticut, supra, or whether they were embarking upon a new course of selective incorporation of those procedural guarantees suitable for juvenile court proceedings. See Commonwealth v. Johnson, 211 Pa.Super. 62, 234 A.2d 9 (1967).

The government urges that this latter interpretation is correct and that federal juvenile court proceedings are circumscribed by a juvenile due process standard found in the Fifth Amendment. Nieves argues that state criminal prosecutions and juvenile court proceedings are governed by the same Fourteenth Amendment requirements, and thus federal criminal prosecutions and juvenile court proceedings are governed by the same Bill of Rights standards. The difference of opinion is critical, since due process has never been interpreted by the Supreme Court to require a trial by jury.[8]

---

**6.** "A juvenile alleged to have committed one or more acts in violation of a law of the United States not punishable by death or life imprisonment, and not surrendered to the authorities of a state, shall be proceeded against as a juvenile delinquent if he consents to such procedure, unless the Attorney General, in his discretion, has expressly directed otherwise." 18 U.S.C. § 5032 (1964).

**7.** We might note that in *Singer* the emphasis was on more rather than fewer jury trials. The application of the *Singer*

rationale to *Jackson* and the case at bar would have quite the opposite effect.

**8.** It should be recognized, however, that in recent years the Supreme Court has found a substantial number of Bill of Rights protections to be "fundamental" and therefore required under a due process standard. See, e. g., Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 2d 923 (1965) (right of confrontation); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (privilege against self-incrimination); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792,

■ The right to a jury trial is available in all non-petty federal criminal prosecutions. U.S.Const. Amend. VI. Notwithstanding the fact that the FJDA seems to indicate that federal juvenile court proceedings are not to be considered criminal, 18 U.S.C. § 5032 (1964), we read *Gault* to require the availability of that right in any federal juvenile proceeding in which a youth is faced with incarceration for the commission of an act alleged to be violative of federal law.[9] It is clear to us that an FJDA proceeding which may lead to a juvenile's loss of liberty by incarceration, for purposes of the Sixth Amendment right to trial by jury, is in nature a criminal prosecution, and the constitutionally guaranteed right of a trial by jury in all federal criminal prosecutions must, therefore, accompany such a proceeding. In our view, this conclusion is mandated by the Supreme Court's discussion of the privilege against self-incrimination in *Gault*.

■ The privilege can only be raised to protect an individual from being forced to make disclosures which could be used against him in a criminal prosecution. Murphy v. Waterfront Comm., supra, 378 U.S. at 94, 84 S.Ct. 1594. In finding the privilege applicable to youths faced with juvenile court proceedings, the Court found those proceedings to be criminal prosecutions. "[J]uvenile proceedings to determine 'delinquency,' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination." In re Gault, supra, 387 U.S. at 49, 87 S.Ct. at 1455.

■ When forced to decide whether juvenile court proceedings were civil or criminal in order to determine the applicability of a federal right which turns on the distinction, the Court did not hesitate in choosing the latter. We are convinced that this classification applies equally to the right of trial by jury in a juvenile court proceeding.

To a large extent, the decisions of the lower federal courts support our conclusion that the Bill of Rights and not "due process" governs federal juvenile court proceedings. The prevailing view might seem at first glance to be that the latter controls, on the theory that juvenile court proceedings are civil rather than criminal. See, e. g., Pee v. United States, 107 U.S.App.D.C. 47, 274 F.2d 556 (1959). This is somewhat misleading, however, since a large number of cases espousing the due process standard emanate from the D.C. Circuit, where a separate D.C. Juvenile Court Act governs, therein providing the same rights for youths in juvenile courts as their elders receive in criminal courts. See United States v. Dickerson, 168 F.Supp. at 902. Thus, the D.C. Circuit has been concerned primarily with the standards governing a juvenile court's waiver of jurisdiction, see, e. g., Kent v. United States, 119 U.S.App.D.C. 378, 343 F.2d 247 (1965), rev'd, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), and the applicability of the *Mallory* exclusionary rule, Mallory v. United States, 354

9 L.Ed.2d 799 (1963) (right to appointed counsel).

Some doubt has also been cast upon the continued unavailability of the right to jury trial in state criminal prosecutions. In Reid v. Covert, supra, the Supreme Court noted that "in view of our heritage and the history and adoption of the Constitution and the Bill of Rights, it seems peculiarly anomalous to say that trial before a civilian judge and by an independent jury picked from the common citizenry is not a fundamental right." Id. 354 U.S. at 9, 77 S.Ct. at 1226 (dictum). In addition, during this term, the Supreme Court has agreed to hear a case

squarely raising the question of whether due process requires the states to grant jury trials in criminal prosecutions. Duncan v. Louisiana, 250 La. 253, 195 So.2d 142 (1967), prob. juris. noted, 389 U.S. 809, 88 S.Ct. 98, 19 L.Ed.2d 63 (1967) (No. 410).

9. A determination of delinquency under the FJDA necessitates a finding that a law of the United States has been violated. 18 U.S.C. § 5031 (1964). The Act is not concerned with mere truants or incorrigibles. Cf. In re Elmore, 222 A.2d 255 (D.C.Mun.Ct.App.1966), reversed on other grounds, 382 F.2d 125 (D.C.Cir. 1967).

U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), to confessions taken from juveniles prior to that waiver and subsequently introduced against them in criminal proceedings. See, e. g., Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (1961); Pee v. United States, supra. Nearly everything they have said about the applicability of the Bill of Rights to juvenile court proceedings has been said by way of dictum.

Other courts, while first stating that due process governs, have gone on to conclude that this standard in a federal juvenile court compels "the same safeguards for a juvenile as for an adult charged with the same offense." United States v. Morales, 233 F.Supp. 160, 164–65 (D. Mont.1964). Still other federal courts have spoken of due process only to hold state juvenile proceedings up to that standard. See Hegwood v. Kindrick, 264 F.Supp. 720 (S.D.Tex.1967).

A growing number of opinions have swept aside technical distinctions between the criminal and civil labels and, looking to the nature of the proceedings, have held that the Bill of Rights guarantees must be made available in federal juvenile courts. See Trimble v. Stone, supra; In re Poff, supra; United States v. Dickerson, supra.[10]

With rare exceptions, whenever a youthful litigant has contended that one of the Bill of Rights guarantees must be made available to him in a juvenile court proceeding, his claim has been upheld. Cf. Shioutakon v. District of Columbia, 98 U.S.App.D.C. 371, 236 F.2d 666, 60 A.L.R.2d 686 (1956) (right to counsel found by statutory interpretation). In light of *Gault*, we uphold Nieves' claim that he is entitled to a jury in his juvenile court proceedings.

## V.

The government, in arguing for a juvenile due process standard, suggests that the right to trial by jury is the Bill of Rights guarantee least applicable to juvenile court proceedings. Since they facilitate a casework relationship and avoid the stigma of a quasi-criminal trial, private hearings are said to lie at the heart of the juvenile court philosophy. See, e. g., Geis, Publicity and Juvenile Court Proceeding, 30 Rocky Mt.L.Rev. 101, 113 (1958).

The most cogent argument for the inapplicability of a jury is said to come from an article written by Professor Paulsen of Columbia:

"A jury trial would inevitably bring a good deal more formality to the juvenile court without giving a youngster a demonstrably better fact-finding process than trial before a judge. The jury provides the accused with a weapon against political crimes repressive of civil liberties, a weapon juveniles do not generally need. Paulsen, Fairness to the Juvenile Offender, 41 Minn. L.Rev. 547, 559 (1957).

Since *Gault* was decided, one state court has found jury trial inapplicable to juvenile court proceedings, relying heavily on each of the above-mentioned rationales. Commonwealth v. Johnson, supra; see In re Ronny, 40 Misc.2d 194, 210, 242 N.Y.S.2d 844, 860 (Queens Coun. Fam.Ct.Juv.T.1963) (dictum).[11]

---

10. Similarly, non-constitutional protections have been found applicable to FJDA proceedings by statutory interpretation. In United States v. Glover, 372 F.2d 43 (2d Cir.1967), the Second Circuit read the Act to require a *Mallory* exclusionary rule for confessions taken from juveniles after an unnecessary delay in arraignment.

11. There have also been two recent state court cases holding juveniles to be entitled to jury trials in juvenile courts. Peyton v. Nord, 437 P.2d 716 (N.M.1967) (statutory interpretation); In re Rindell,

36 U.S.L.Week 2468 (R.I.Fam.Ct. Jan. 10, 1968) (In light of *Gault*). In addition, the Supreme Court has agreed to review a case this term which raises, *inter alia*, the question of whether the federal constitution requires the states to grant jury trials in juvenile court proceedings. In re Whittington, 13 Ohio App. 2d 11, 233 N.E.2d 333, cert. granted, 389 U.S. 819, 88 S.Ct. 112, 19 L.Ed.2d 69 (1967) (No. 36, Misc.; renumbered No. 701).

Though the sociological arguments against the applicability of jury trial are not 'totally unfounded, they do not impress us as requiring a result contrary to the one we have reached. The statute empowers the district courts to hold FJDA proceedings in open court, 18 U.S.C. § 5033 (1964), and, as heretofore mentioned, nearly all FJDA proceedings in the Southern District are held in that manner.[12] This is but an additional reason for recognizing a juvenile's right to a jury trial in these proceedings.

Closed proceedings may be held, of course, whether the juvenile elects trial by jury or not. He may have an open, public trial or waive his right to one. See Note, 79 Harv.L.Rev. 775, 794 (1966). In any event he may, and in most cases probably will, waive his right to be tried by a jury, and it is doubtful that the government will in such a case impress a jury trial upon him.

In conclusion, we might note that Professor Paulsen no longer is a leading exponent of non-jury juvenile proceedings. We quote him at length to indicate what we see as a marked shift in extrajudicial attitude toward juvenile procedures:

> "It is probably true that some of the adult protection that the reformers sought to avoid could be introduced into the juvenile court without completely hampering its operation. The right to a jury trial is preserved in some states and the juvenile courts still function with jury trials, although, in fact, the right is usually waived. A constitutional right to a public trial has rarely been invoked. If a child properly advised by parents and counsel, wishes a public trial, why should he not have it? In my view the reformers, in their desire to distinguish sharply between juvenile and criminal proceedings and in the hope that chil-

dren would be processed as patients in a clinic or given social education as in a school, put too much emphasis on the need for informal procedure. The child and his parents are under no illusion. They know they are in court, not in school or at a doctor's office." Paulsen, Kent v. United States: The Constitutional Context of Juvenile Cases, 1966 Sup.Ct.Rev. 167, 186.

We hold that to the extent it deems consent to FJDA proceedings a waiver of jury trial and requires that these proceedings be held without jury, 18 U.S.C. § 5033 (1964) impairs a juvenile's free exercise of his Sixth Amendment right and is therefore invalid.

 We set aside Nieves' waiver of jury trial executed April 26, 1967, since we hold it to have been impermissibly extracted. The government having decided to permit him to proceed under the FJDA, Nieves may now choose to do so or elect criminal prosecution. In either event, he is entitled to a trial by jury if he so desires.

It is so ordered.

---

12. If the formality of proceedings in open court may heighten youths' feelings of alienation, it seems at least equally likely that they infuse in them a respect for the legal system. See Dorsen, The Second Revolution in Juvenile Court,

158 N.Y.L.J. 46 (1967). It is open to question whether the lack of privacy inherent in open court juvenile proceedings is in any way detrimental to the juveniles' potential rehabilitation.